No. 25-3664

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

SCOTT TURNER in his official capacity as Secretary of the U.S. Department of
Housing and Urban Development, et al.,

Defendants-Appellants,

v.

MARTIN LUTHER KING, JR. COUNTY, et al.,

Plaintiffs-Appellees.

## APPELLEES' RESPONSE BRIEF

Paul J. Lawrence
Jamie Lisagor
Sarah S. Washburn
Meha Goyal
Luther Reed-Caulkins
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101
Paul.Lawrence@PacificaLawGroup.com
Jamie.Lisagor@PacificaLawGroup.com
Sarah.Washburn@PacificaLawGroup.com
Meha.Goyal@PacificaLawGroup.com
Luther.Reed-Caulkins@PacificaLawGroup.com

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................1

II.     JURISDICTIONAL STATEMENT ...................................................3

III.    STATEMENT OF ISSUES PRESENTED FOR REVIEW ............3

IV.     STATEMENT OF THE CASE...........................................................4

        A. The Local Governments Rely on Federal Grants to Provide Critical
           Public Services ..........................................................................4

           1. HUD's CoC Program Funds Homelessness Services ...........4

           2. DOT Administers Statutory Transit and Infrastructure Grants .............6

        B. The Federal Agencies Impose New, Unlawful Conditions on CoC
           and DOT Grants ........................................................................7

           1. HUD's New CoC Conditions ...............................................9

           2. DOT's New Conditions ......................................................12

        C. The District Court Enjoins the Challenged Conditions...........15

V.      STANDARD OF REVIEW ...........................................................18

VI.     SUMMARY OF ARGUMENT ......................................................20

VII.    ARGUMENT ..................................................................................23

        A. The Local Governments Are Likely to Succeed on the Merits................23

           1. The District Court Correctly Ruled Congress Has Not Authorized
              the Challenged Conditions....................................................23

              a. Title VI Does Not Authorize the Discrimination Conditions..........24

              b. Section 11386(b)(8) Does Not Authorize the Other CoC
                 Conditions ......................................................................31

           2. The District Court Correctly Ruled the Federal Agencies'
              Actions Are Arbitrary and Capricious..................................39

           3. The Local Governments Are Likely to Succeed on the Merits of
              Their Spending Clause and Procedural APA Claims ..........................44

i

a. The Conditions Exceed Even Congress's Spending Power .............44

b. HUD Failed to Follow Its Own Regulations ...................................47

B. The District Court Properly Determined the Local Governments Will Suffer Irreparable Harm if the Conditions Are Not Enjoined .................48

C. The District Court Properly Determined the Equities Weigh in the Local Governments' Favor ........................................................................56

D. The Federal Agencies Waive Any Challenge to the DOT Immigration Enforcement Condition and DOT and COC EO Conditions ...........................................................................................60

VIII. CONCLUSION ...............................................................................60

# TABLE OF AUTHORITIES

## Cases

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*,
   75 F.4th 760 (7th Cir. 2023) ................................................26

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022) .............................................27

*Al Otro Lado v. Wolf*,
   952 F.3d 999 (9th Cir. 2020) ..............................................58

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
   948 F.2d 536 (9th Cir. 1991) ..............................................50

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ............................................19

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) ....................................... 48, 51

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
   548 U.S. 291 (2006) ...........................................................34

*ASSE Int'l, Inc. v. Kerry*,
   803 F.3d 1059 (9th Cir. 2015) ............................................40

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,
   501 U.S. 1301 (1991) .........................................................56

*Barton v. Office of Navajo*,
   125 F.4th 978 (9th Cir. 2025) ............................................40

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ...................................................... 33, 34

*Brown v. Rawson-Neal Psychiatric Hosp.*,
   840 F.3d 1146 (9th Cir. 2016) ............................................60

*California v. Bernhardt*,
   472 F. Supp. 3d 573 (N.D. Cal. 2020) ....................... 41, 42, 43

iii

*California v. EPA*,
72 F.4th 308 (D.C. Cir. 2023) ..............................................................41

*Castaneira v. Noem*,
138 F.4th 540 (D.C. Cir. 2025) ............................................................47

*Cir. City Stores, Inc. v. Adams*,
532 U.S. 105 (2001) ..............................................................................35

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) .......................................... 23, 24, 34, 53

*City & Cnty. of San Francisco v. Trump*,
No. 3:25-cv-01350-WHO, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025) (9th
Cir. Jun. 23, 2025) ..................................................................................8

*City of Arlington v. F.C.C.*,
569 U.S. 290 (2013) ..............................................................................24

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020) ................................................................54

*City of Los Angeles v. Barr*,
929 F.3d 1163 (9th Cir. 2019) ..........................................................6, 43

*City of Los Angeles v. McLaughlin*,
865 F.2d 1084 (9th Cir. 1989) ................................................................6

*Clinton v. City of New York*,
524 U.S. 417 (1998) ..............................................................................23

*Cmty. Legal Servs. in East Palo Alto v. U.S. Dep't of Health & Human Servs.*,
137 F.4th 932 (9th Cir. 2025) ...............................................................57

*Cnty. of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal 2017) ...................................................49

*Cnty. of Westchester v. U.S. Dep't of Hous. & Urban Dev.*,
802 F.3d 413 (2d Cir. 2015) .................................................................33

*Dalton v. Specter*,
511 U.S. 462 (1994) ......................................................... 50, 51, 52, 53

*Diemert v. City of Seattle*,
  776 F. Supp. 3d 922 (W.D. Wash. 2025)..............................................27

*Disney Enters. Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) ...........................................................56

*Doe #1 v. Trump*,
  957 F.3d 1050 (9th Cir. 2020) .........................................................58

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) .........................................................56

*E. Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018) ...........................................................58

*Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*,
  630 F.3d 1153 (9th Cir. 2011) .................................................. 19, 44

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)........................................................................39

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
  98 F.4th 1180 (9th Cir. 2024) .........................................................57

*Fort Stewart Schs. v. Fed. Labor Rels. Auth.*,
  495 U.S. 641 (1990)........................................................................47

*Global Health Council v. Trump*,
  No. 25-5097, 2025 WL 2326021 (D.C. Cir. Aug. 13, 2025)...............53

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ...........................................................26

*Hart v. Massanari*,
  266 F.3d 1155 (9th Cir. 2001) .........................................................53

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) .................................................. 48, 51

*Index Newspapers LLC v. U.S. Marshals Serv.*,
  977 F.3d 817 (9th Cir. 2020) ...........................................................59

*Kousisis v. United States*,
   145 S. Ct. 1382 (2025) ................................................................ 30, 31

*La. Pub. Serv. Comm'n v. F.C.C.*,
   476 U.S. 355 (1986) ............................................................................24

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
   752 F.3d 755 (9th Cir. 2014) .............................................................19

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ...............................................................58

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ............................................................................40

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ............................................................................34

*Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*,
   73 F.4th 657 (9th Cir. 2023) ..............................................................40

*Moranski v. Gen. Motors Corp.*,
   433 F.3d 537 (7th Cir. 2005) ..............................................................27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................ 39, 42

*Murphy Co. v. Biden*,
   65 F.4th 1122 (9th Cir. 2023) ....................................................... 52, 53

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ...................................................................... 46, 47

*Newsom v. Trump*,
   141 F.4th 1032 (9th Cir. 2025) ..........................................................52

*Ohio v. EPA*,
   603 U.S. 279 (2024) ............................................................................40

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ..................................................................... 44, 45, 46

vi

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ................................................................ 45, 46

*Sports Form, Inc. v. United Press Int'l, Inc.*,
    686 F.2d 750 (9th Cir. 1982) ...............................................19

*Sw. Voter Registration Educ. Project v. Shelley*,
    344 F.3d 914 (9th Cir. 2003) ...............................................19

*United States v. Carlson*,
    900 F.2d 1346 (9th Cir. 1990) .............................................50

*United States v. Peninsula Commc'ns, Inc.*,
    287 F.3d 832 (9th Cir. 2002) ...............................................19

*United States v. Williams*,
    553 U.S. 285 (2008) ............................................................ 35, 36

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
    579 U.S. 176 (2016) ...........................................................9, 30

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) .............................................58

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) .............................................57

*Washington v. Trump*,
    No. 25-807, 2025 WL 2061447 (9th Cir. Jul. 23, 2025) ............................. 49, 55

*West Virginia v. EPA*,
    597 U.S. 697 (2022)............................................................33

*Whitman v. Am. Trucking Ass'ns, Inc.*,
    531 U.S. 457 (2001)............................................................ 33, 34

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...............................................................19

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
    No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ......57

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ...................................................................32

**Statutes**

5 U.S.C. § 706(2) ........................................... 3, 17, 23, 39, 47

8 U.S.C. § 1611(a) ........................................................................37

28 U.S.C. § 1331 ..............................................................................3

31 U.S.C. § 3730(b) ....................................................................27

31 U.S.C. § 3729 .............................................................................8

42 U.S.C. § 2000d .......................................................................25

42 U.S.C. § 11301 ......................................................................4, 59

42 U.S.C. § 11381 ......................................................................5, 35

42 U.S.C. § 11383 ..........................................................................5

42 U.S.C. § 11386(b) .......................................................... passim

42 U.S.C. § 12705c .....................................................................32

42 U.S.C. § 12711 .......................................................................33

Infrastructure Investment and Jobs Act,
   Pub. L. No. 117-58, 135 Stat. 429 (Nov. 15, 2021) ............................43

Consolidated Appropriations Act, 2024,
   Pub. L. No. 118-42, 138 Stat. 25 (Mar. 9, 2024) ................................12

**Regulations**

24 C.F.R. § 1.4(b) ........................................................................28

24 C.F.R. § 578.23(c) ..............................................................5, 47

24 C.F.R. § 578.3 ...........................................................................5

24 C.F.R. § 5.106 ........................................................................42

49 C.F.R. § 21.5(b) ...................................................................................28

**Other Authorities**

Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
62 Fed. Reg. 61344 (Nov. 17, 1997) ..................................................37

Verification of Eligibility for Public Benefits,
63 Fed. Reg. 41662 (Aug. 4, 1998) ....................................................37

## I.    INTRODUCTION

Plaintiffs-Appellees ("Local Governments") rely on billions of dollars in federal grants to fund critical homelessness assistance programs and public transportation projects. They sued to prevent Defendants-Appellants ("Federal Agencies") from imposing unlawful conditions ("Conditions") on those federal grants. The grants are authorized, funded, and awarded based on specific criteria established by Congress, with little discretion left to the Federal Agencies. Yet, the Federal Agencies have sought to impose the Conditions—which implement the Trump Administration's policy directives—without congressional authorization, prior notice, or contemporaneous explanation. The district court properly issued a preliminary injunction prohibiting their imposition or enforcement, maintaining the status quo as to congressionally authorized grant funds during this lawsuit.

The district court correctly ruled the Federal Agencies likely violated the Administrative Procedure Act ("APA") because the Conditions exceed the Federal Agencies' statutory authority, violate the separation of powers doctrine, and are arbitrary and capricious. This Court should affirm that well-supported ruling. Additionally, the record shows the Conditions exceed even Congress's power to condition federal funding and conflict with the Federal Agencies' own regulations. Thus, although not addressed by the district court, this Court may also affirm on the Local Governments' Spending Clause and procedural APA claims. Finally, the

district court properly determined the Local Governments will suffer irreparable injury because they are faced with the Hobson's choice of agreeing to unlawful Conditions or losing billions in critical federal grants, and the balance of equities tips sharply in their favor.

Neither of the Federal Agencies' two principal arguments on appeal has merit, and both are undermined by the substantial record below. First, the Federal Agencies argue the Conditions prohibiting diversity, equity, and inclusion ("DEI") initiatives ("Discrimination Conditions") are the same as those previously imposed pursuant to federal nondiscrimination law. But that argument ignores the executive order the Discrimination Conditions implement, as well as the Federal Agencies' statements confirming their intent to apply the Administration's new and unsupported interpretation of federal law to ban all DEI programs—a position contrary to case authority and not authorized by Congress. Second, the Federal Agencies attempt to justify some Conditions based on generic language in a single statute authorizing conditions that promote "efficiency." But under basic rules of statutory interpretation, that provision cannot justify conditions unrelated to, and in some instances inconsistent with, Congress's express purposes in establishing that program.

In rejecting the Federal Agencies' efforts to force the Local Governments to obey the Administration's policy directives over those authorized by Congress, the

2

district court neither abused its discretion nor based its decision on an erroneous legal standard or clearly erroneous findings of fact. This Court should affirm.

## II.     JURISDICTIONAL STATEMENT

The Local Governments agree with the Federal Agencies' jurisdictional statement and clarify the district court had jurisdiction under 28 U.S.C. § 1331 because their claims arise under the U.S. Constitution and federal statutes.

## III.     STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Under the Constitution, Congress—not the Executive—exercises the power of the purse. Conditions on federal grants must be authorized by Congress or consistent with a specific congressional delegation. Moreover, even Congress cannot impose conditions that are ambiguous, coercive, or not germane to the funding at issue. Did the Local Governments show they are likely to prevail on the merits of their claims that the Conditions are without statutory authority, unconstitutional, and violate the APA, 5 U.S.C. § 706(2)(B) and (C)?

2.     The APA prohibits arbitrary and capricious agency action and requires federal agencies to adhere to their own regulations. The Federal Agencies imposed the Conditions without any explanation, much less the reasoned decision-making the APA requires, and in violation of applicable regulations. Did the Local Governments show they are likely to prevail on the merits of their claims that the Conditions violate the APA, 5 U.S.C. § 706(2)(A) and (D)?

3

3. The Local Governments face a choice between two untenable options: accepting the unlawful Conditions or losing billions in federal grants for urgently needed homelessness and transportation services, including funding they have already budgeted and/or committed to spending. Did the Local Governments show they will suffer irreparable injury absent injunctive relief and the balance of equities tips in their favor?

## IV. STATEMENT OF THE CASE

### A. The Local Governments Rely on Federal Grants to Provide Critical Public Services.

The Local Governments are thirty-one cities, counties, and local housing and transportation agencies that collectively rely on billions of dollars in statutorily authorized federal grants to provide essential services. At issue here are grants administered by the Department of Housing and Urban Development ("HUD") and the Department of Transportation ("DOT").

### 1. HUD's CoC Program Funds Homelessness Services.

Recognizing that a "record increase in homelessness" had resulted in local governments and others being "unable to meet the basic human needs of all the homeless," Congress passed the McKinney-Vento Homeless Assistance Act ("Homeless Assistance Act") to "provide funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(a)(5), (b)(3). The

4

Homeless Assistance Act established the Continuum of Care ("CoC") program to "promote community-wide commitment to the goal of ending homelessness" and "provide funding for . . . local governments to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused . . . by homelessness." 42 U.S.C. § 11381. HUD issues a Notice of Funding Opportunity ("NOFO") and then awards CoC grants to local coalitions, known as "Continuums," through a competitive process. *Id.* § 11382; 24 C.F.R. § 578.3. The grants are subject to conditions established in the Homeless Assistance Act, HUD regulations, and NOFO. 42 U.S.C. § 11386(b); 24 C.F.R. § 578.23(c).

CoC grants fund critical services such as rapid rehousing, permanent and transitional housing, and case management services connecting at-risk individuals to healthcare, job training, and other resources. 42 U.S.C. § 11383. Local Governments[1] rely on CoC grants to serve tens of thousands of residents experiencing, or at risk of, homelessness. Pursuant to a July 2024 NOFO,[2] Local

---

[1] The Local Governments that sought preliminary relief against HUD are Martin Luther King, Jr. County ("King County"), Pierce County, Snohomish County, City and County of San Francisco ("San Francisco"), County of Santa Clara ("Santa Clara"), City of Boston ("Boston"), City of New York ("NYC"), City of Cambridge ("Cambridge"), King County Regional Homelessness Authority ("KCRHA"), Metropolitan Government of Nashville & Davidson County ("Nashville"), City of Pasadena ("Pasadena"), Pima County, City of San José ("San José"), Santa Monica Housing Authority ("Santa Monica HA"), and City of Tucson ("Tucson").

[2] U.S. Dep't of Housing & Urban Dev., Notice of Funding Opportunity for FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program (Jul. 24, 2024),

Governments and their Continuums were conditionally awarded hundreds of millions of dollars, collectively, in CoC grants—and have since expended and/or committed millions of dollars for homelessness assistance services in reliance on those awards. *See, e.g.*, 3-SER-726 ¶ 24 (Cambridge); 1-SER-130 ¶ 19 (Pasadena).

### 2. DOT Administers Statutory Transit and Infrastructure Grants.

DOT, often acting through its operating administrations ("OAs")—including the Federal Transit Administration ("FTA"), Federal Highway Administration ("FHWA"), Federal Aviation Administration ("FAA"), and Federal Railroad Administration ("FRA")—administers competitive and formula grant programs Congress authorized to improve the nation's transportation infrastructure and operation.[3] ER-77–89. These include FTA programs for public transit projects; FHWA programs for road and street infrastructure and safety projects; FAA programs for airport planning and development; FRA programs for rail infrastructure and safety projects; and DOT's Strengthening Mobility and Revolutionizing Transportation ("SMART") program for development of advanced transportation safety and efficiency technologies. *See id.* Each grant program is

---

https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf. Websites cited in this brief were last visited on August 13, 2025.

[3] Competitive grant programs allocate a limited pool of funds to applicants approved by a federal agency, *City of Los Angeles v. Barr*, 929 F.3d 1163, 1169 (9th Cir. 2019), whereas formula grants "are awarded pursuant to a statutory formula" set by Congress, *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989).

subject to conditions set forth in the authorizing statutes. *See* ER-77–88 ¶¶ 86–89, 93, 99, 101, 105, 109, 112, 117 (discussing statutory authorities).

The Local Governments[4] rely on billions of dollars, collectively, in DOT grants for a wide range of transportation improvement and maintenance projects that benefit their communities and make roadways, mass transit, railways, and airports safer. ER-79–89 ¶¶ 91, 103, 110, 114, 120; *see also, e.g.,* 1-SER-68–74 ¶¶ 6–32; 3-SER-703–707 ¶¶ 4–8; 5-SER-1040–1041 ¶¶ 11–15.

## B. The Federal Agencies Impose New, Unlawful Conditions on CoC and DOT Grants.

Since taking office, President Trump has issued several executive orders directing executive agency heads to impose new and newly interpreted conditions on federal funding:

- **DEI Order:** Directs federal agency heads to include "in every . . . grant award" terms requiring the recipient to certify "it does not operate any programs promoting DEI" that would violate federal nondiscrimination laws and that its compliance with such laws is "material to the government's payment decisions" for purposes of the False Claims Act

---

[4] The Local Governments that sought preliminary relief against DOT are City of Bend ("Bend"), Boston, City of Chicago ("Chicago"), City of Columbus ("Columbus"), City of Culver City ("Culver City"), City and County of Denver ("Denver"), Intercity Transit, King County, City of Minneapolis ("Minneapolis"), Nashville, NYC, Pierce County, Pima County, City of Pittsburgh ("Pittsburgh"), Port of Seattle, City of Portland ("Portland"), San Francisco, San José, Santa Clara, City of Santa Monica ("Santa Monica"), Snohomish County, County of Sonoma ("Sonoma County"), Central Puget Sound Regional Transit Authority ("Sound Transit"), San Francisco County Transportation Authority ("SFCTA"), Treasure Island Mobility Management Agency ("TIMMA"), Tucson, and City of Wilsonville ("Wilsonville").

("FCA"), 31 U.S.C. §§ 3729 et seq. Exec. Order No. 14173 § 3(b)(iv)(A)–(B), 90 Fed. Reg. 8633 (Jan. 21, 2025).

- **Immigration Order:** Directs agency heads to ensure "Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation"; "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit"; and "take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including . . . [the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA")]." Exec. Order No. 14218 § 2(i)–(ii), 90 Fed. Reg. 10581 (Feb. 19, 2025).[5]

- **Gender Ideology Order:** Directs agency heads to "assess grant conditions" to "ensure grant funds do not promote gender ideology." Exec. Order No. 14168 § 3(g), 90 Fed. Reg. 8615 (Jan. 20, 2025).

- **Abortion Order:** Declares United States' policy "to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." Exec. Order No. 14182 § 1, 90 Fed. Reg. 8751 (Jan. 24, 2025).

Following these executive orders, the Federal Agencies began imposing on CoC and DOT grants new Conditions that are intended to implement the President's policy priorities but lack congressional authorization.

---

[5] A district court preliminarily enjoined the federal government from "directly or indirectly taking any action to withhold, freeze, or condition federal funds from" sixteen cities and counties—including King County, Santa Clara, San Francisco, Minneapolis, San José, and Portland—on the basis of Immigration Order § 2(a)(ii), *City & Cnty. of San Francisco v. Trump*, No. 3:25-cv-01350-WHO, 2025 WL 1186310, at *3 & n.2 (N.D. Cal. Apr. 24, 2025), *appeal docketed*, No. 25-3889 (9th Cir. Jun. 23, 2025). That case raises facial challenges to the Immigration Order; Local Governments here challenge HUD's and DOT's actions attaching the new unlawful Conditions to the grants at issue.

### 1.  HUD's New CoC Conditions.

In March 2025, HUD began sending CoC grant agreements ("CoC Agreements") to Local Governments that had already received conditional CoC awards under the July 2024 NOFO. *See, e.g.,* 7-SER-1659–1667. The CoC Agreements contain the following new and newly interpreted CoC Conditions:

**CoC Discrimination Condition:** The CoC Agreements require the recipient to certify "its compliance **in all respects** with all applicable Federal antidiscrimination laws is material to the government's payment decisions for purposes of [the FCA]" and "it does not operate any programs that violate any applicable Federal anti-discrimination laws." 7-SER-1661 (emphasis added). FCA liability, which carries steep penalties including treble damages, ordinarily attaches only if an alleged misrepresentation was "material to the Government's payment decision"—an element the Supreme Court has called "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016). But the CoC Discrimination Condition seemingly requires concession of this element of FCA liability if the recipient has **any** purportedly unlawful DEI initiatives, whether or not funded by a CoC grant.

While the Local Governments have certified compliance with nondiscrimination law in the past, the Administration's communications to federal grant recipients make clear that federal agencies—including HUD—are purporting

9

to reinterpret the law to prohibit DEI beyond what any court has held. *See, e.g.*, Scott Turner Post of Mar. 13, 2025, https://x.com/SecretaryTurner/status/1900257331184570703 (HUD Secretary Turner's statement that "CoC funds . . . will not promote DEI"); Press Release, HUD, *HUD Delivers Mission-Minded Results in Trump Administration's First 100 Days* (Apr. 29, 2025), https://www.hud.gov/news/hud-no-25-059 (HUD is aligning all "grant agreements with [President Trump's] Executive Orders" by "removing [DEI]"); *see also infra* Section IV.B.2 (discussing similar DOT communications). Confirming this view, Deputy U.S. Attorney General Todd Blanche recently announced a new initiative to use the FCA against federal funding recipients that engage in purportedly "unlawful discrimination" via DEI policies. 5-SER-1180–1181 ("Blanche Memo"). The Blanche Memo instructs each U.S. Attorney's Office to assign an attorney to bring such FCA claims and "strongly encourages" private parties to do the same. 5-SER-1181.

**CoC Immigration Enforcement Condition:** The CoC Agreements provide: "No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation." 7-SER-1661. This is a near-verbatim recitation of the Immigration Order § 2(a)(ii).

10

**CoC Immigration Verification Condition:** The CoC Agreements impose requirements purportedly related to verifying immigration status:

> Subject to the exceptions provided by PRWORA, the recipient must use [the Systematic Alien Verification for Entitlements ("SAVE") system], or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

7-SER-1661. On April 4, 2025, Secretary Turner issued a letter to all HUD grant recipients confirming the CoC Immigration Verification and Enforcement Conditions were being imposed to "compl[y] with" the Immigration Order. 7-SER-1669 ("Turner Letter"). The condition is not limited to the recipient's use of CoC funds.

**CoC Gender Ideology Condition:** The CoC Agreements prohibit the recipient from using grant funds "to promote 'gender ideology,' as defined in [the Gender Ideology Order]." 7-SER-1661. The CoC Agreements do not define what it means to "promote gender ideology." The Gender Ideology Order states: "'Gender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." Gender Ideology Order § 2(f).

**CoC Abortion Condition:** The CoC Agreements prohibit the recipient from using grant funds "to fund or promote elective abortions, as required by [the

11

Abortion Order]." 7-SER-1661. The CoC Agreements do not define what it means to "promote elective abortions." While the Hyde Amendment—purportedly "enforced" by the Abortion Order—prohibits use of federal funds to "pay for an abortion" (subject to narrow exceptions) or "require any person to perform, or facilitate in any way the performance of, any abortion," Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, §§ 202–03, 138 Stat. 25, 153 (Mar. 9, 2024), it does not prohibit use of federal funds to "promote elective abortion."

**CoC EO Condition:** The CoC Agreements state that "[t]his Agreement, the Recipient's use of funds provided under this Agreement . . . , and the Recipient's operation of projects assisted with Grant Funds" are "governed by" not only specified statutes, regulations, and grant documents, but also "all current Executive Orders." 7-SER-1661. This condition purports to incorporate all executive orders, including the DEI, Immigration, Gender Ideology, and Abortion Orders, into the recipient's use of CoC grants—as well as projects "assisted with" such funds.[6]

### 2. DOT's New Conditions.

In April 2025, DOT Secretary Sean Duffy issued a letter ("Duffy Letter") to all DOT funding recipients announcing a policy to impose anti-DEI and immigration

---

[6] While conditions purporting to require compliance with executive orders pre-date the Trump Administration, the current Administration is relying on executive orders to reinterpret federal law and impose grant conditions not authorized by Congress. *See infra* Section VII.A.1. Thus, the EO Condition apparently provides another vehicle for the Federal Agencies' overreach.

12

enforcement conditions on all DOT grants, in line with the DEI and Immigration Orders' policy priorities. 9-SER-2054–2057. The Duffy Letter articulates DOT's sweeping reinterpretation of federal nondiscrimination law, stating that "[w]hether or not described in neutral terms, any policy . . . that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called [DEI] goals, **presumptively** violates Federal law." 9-SER-2055 (emphasis added). It then asserts recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding" immigration authorities "in the enforcement of Federal immigration law," and that declining to use local resources to cooperate "may give rise to civil and criminal liability." 9-SER-2055.

Consistent with the Duffy Letter, in spring 2025, DOT and its OAs began including in DOT grant agreements ("DOT Agreements") new DOT Conditions in substantially the same form:

**DOT Discrimination Condition:** The DOT Agreements require the recipient to agree, "[p]ursuant to" the DEI Order § 3(b)(iv), that "it does not operate any programs promoting [DEI] initiatives that violate any applicable Federal anti-discrimination laws," and "its compliance in all respects with all applicable Federal antidiscrimination laws is material to the government's payment decisions for purposes of [the FCA]." *E.g.*, 8-SER-1719–1720 (FTA); 3-SER-589 (FAA); SER-

13

2-SER-474 (FHWA); 2-SER-319 (FRA); 2-SER-423 (DOT). The condition is not limited to the recipient's use of DOT funds.

Again, while DOT previously required recipients to certify compliance with federal nondiscrimination law, the DEI Order, Duffy Letter, and subsequent agency statements and actions make clear the condition is intended to prohibit all DEI programs even if lawful under established nondiscrimination law. *See* 7-SER-1659–1667; *see also infra* Section VII.A.1.

**DOT Immigration Enforcement Condition:** The DOT Agreements require the recipient to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." *E.g.*, 8-SER-2002 (FTA); 3-SER-590 (FAA); 2-SER-474 (FHWA); 2-SER-318–319 (FRA); 2-SER-423 (DOT).The condition applies broadly to the recipient's activities and is not limited to use of DOT funds.

**DOT EO Condition:** The DOT Agreements require that recipients "comply with all applicable Federal laws, regulations, **executive orders**, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this [grant]." 3-SER-610 (FAA) (emphasis added); *see also* 2-SER-484

14

(FHWA); 2-SER-341 (FRA); 2-SER-373 (DOT).[7] Like HUD's CoC EO Condition, this condition purports to incorporate all executive orders, including the DEI, Immigration, Gender Ideology, and Abortion Orders, into the recipient's use of DOT grant funds. *See supra* note 6.

Pursuant to the policy announced in the Duffy Letter, DOT and its OAs have imposed these Conditions seemingly on all DOT grants. *See, e.g.,* 5-SER-1042–1043, -1046 ¶¶ 21–24, 31; 3-SER-653–654 ¶ 14; 3-SER-708–709 ¶¶ 13–15; 1-SER-215–216 ¶¶ 8–11.

### C.   The District Court Enjoins the Challenged Conditions.

On May 2, 2025, eight Local Governments sued HUD, DOT, and FTA challenging as unlawful the CoC Conditions, as well as the DOT Conditions as imposed by FTA. ER-207. Facing imminent and irreparable harms due to impending signing deadlines, seven of those Local Governments moved for a temporary restraining order ("TRO") enjoining enforcement of the unlawful Conditions.[8] The district court granted the TRO on May 7, temporarily enjoining HUD, DOT, and

---

[7] FTA recipients must "agree[] to comply with all applicable federal requirements," which includes "an applicable federal law, regulation, **or executive order**." 8-SER-1841, -1849 (emphasis added).

[8] The original Local Governments were King County, Pierce County, Snohomish County, San Francisco, Santa Clara, Boston, and NYC, as well as Columbus, which did not join the first TRO or preliminary injunction motions. *See* D. Ct. Dkt. # 1. In those initial motions, only King County challenged the DOT Conditions as imposed by FTA.

FTA from, among other things, imposing or enforcing the challenged Conditions. ER-212.

The parties then briefed and argued the moving Local Governments' request for a preliminary injunction. On May 21, 2025, the district court stated its intent to issue a preliminary injunction by June 4 and extended the existing TRO to that date. ER-212, -214. The same day, the original eight and twenty-three additional cities, counties, and local housing and transit agencies filed an amended complaint adding new claims against DOT and adding as defendants other DOT OAs, which had begun imposing the DOT Conditions. ER-52–156. The Local Governments also filed a second motion for a TRO and preliminary injunction. ER-214. On May 23, the district court issued the second TRO. ER-219.

On June 3, 2025, in a nearly fifty-page decision, the district court granted the Local Governments' first and second preliminary injunction motions and enjoined the Federal Agencies from, *inter alia*, imposing or enforcing the CoC or DOT Conditions against the Local Governments. ER-3–51.

The district court initially rejected the Federal Agencies' jurisdictional challenges, ruling that the Tucker Act does not impliedly forbid the relief the Local Governments seek and that imposing the Conditions is not committed to agency discretion by law. ER-19–32.

16

The district court then ruled that preliminary injunctive relief was warranted. The court first addressed whether the CoC and DOT Conditions violate the APA. The court ruled Congress did not authorize the Conditions for the programs at issue and therefore the Conditions likely violate the separation of powers doctrine and exceed the Federal Agencies' statutory authority. ER-32–39. The court thus concluded the Local Governments are likely to succeed on the merits of their APA claims alleging unconstitutional and unauthorized agency action under 5 U.S.C. § 706(2)(B) and (C). The court also ruled the Local Governments are likely to succeed on the merits of their APA arbitrary and capricious claim, 5 U.S.C. § 706(2)(A), because the Federal Agencies offered no explanation for the Conditions except "rote incorporation of executive orders"—which, the court explained, "does not constitute 'reasoned decisionmaking.'" ER-39–40. Having favorably resolved the Local Governments' claims on APA grounds, the court did not reach their other claims, including stand-alone constitutional separation of powers and Spending Clause claims and additional APA claims. ER-40–41 n.19.

Next, the district court determined the Local Governments demonstrated multiple forms of irreparable harm presently occurring or likely to occur absent preliminary injunctive relief. The court noted they "are facing a choice between two untenable options": accepting unconstitutional conditions or risking loss of critical funding for homelessness and transportation services, "including funding that they

17

have already budgeted and are committed to spending." ER-41–46. The court highlighted the "substantive and detailed evidence illustrating the ways in which a loss of grant funds would be devastating and irreparable, if these risks in fact materialize"—to the Local Governments, their operations, and the constituents they serve. ER-43–46. Finally, the court concluded the balance of equities tips "sharply" in the Local Governments' favor, "squarely reject[ing]" the Federal Agencies' claim that the Local Governments could be compensated for any lost funding after a final decision on the merits. ER-46–47.[9]

The Federal Agencies filed this appeal six days later. ER-174.[10] They purport to appeal the preliminary injunction as to all Conditions except the DOT Immigration Enforcement Condition, *see* Op. Br. at 9 n.1, but their opening brief does not address the merits of either the CoC or DOT EO Conditions.

## V.    STANDARD OF REVIEW

To obtain a preliminary injunction, the Local Governments were required to establish (1) they are likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in their favor;

---

[9] Since then, the Local Governments amended the complaint and moved for a preliminary injunction as to new plaintiffs and claims. D. Ct. Dkt. ## 184, 186. The district court issued a third preliminary injunction on August 12, 2025. D. Ct. Dkt. # 338.

[10] The district court denied the Federal Agencies' motion for a stay pending appeal, ER-47–48. The Federal Agencies have not sought a stay here.

and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A showing of likelihood of success on "any of their claims" is sufficient. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014). Alternatively, an injunction may issue where a plaintiff raises "serious questions going to the merits" and the balance of hardships "tips sharply toward the plaintiff," provided the two other *Winter* factors are met. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (cleaned up).

On appeal, this Court's review is "limited and deferential." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc). This Court will reverse a preliminary injunction order only if the district court "abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *United States v. Peninsula Commc'ns, Inc.*, 287 F.3d 832, 839 (9th Cir. 2002). Mere disagreement with the district court's conclusions is insufficient reason for this Court to reverse. *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982). This Court may affirm on any ground supported by the record. *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1159 (9th Cir. 2011).

19

# VI.    SUMMARY OF ARGUMENT

The district court properly issued a preliminary injunction in favor of the Local Governments prohibiting the Federal Agencies from attaching or enforcing the new and newly interpreted Conditions to billions of dollars of federal homelessness assistance and transportation grants without authority to do so and with none of the processes required by law. This Court should affirm.

The Local Governments are likely to succeed on the merits of their claims that the CoC and DOT Conditions are unconstitutional and unlawful. First, the district court correctly ruled the Conditions violate the separation of powers doctrine and exceed the Federal Agencies' statutory authority, contrary to the APA. As they readily concede, the Federal Agencies have only the authority granted to them by Congress. But Congress has not authorized the Federal Agencies to leverage homelessness and transportation grants to force the Local Governments to adhere to the Trump Administration's policy agenda.

The Federal Agencies rely on two statutes to defend some of the Conditions, but the cited provisions do not grant them the necessary authority. They first argue the Discrimination Conditions are authorized by, and merely reiterate existing obligations under, Title VI of the Civil Rights Act of 1964, which prohibits discrimination by federal funding recipients. But the Federal Agencies fail to grapple with extensive evidence demonstrating the Federal Agencies intend to use the threat

20

of civil and criminal FCA enforcement, paired with a novel and legally unsupported interpretation of Title VI, to wield the Discrimination Conditions as cudgels to eliminate all forms of DEI.

The Federal Agencies also assert that a single, narrow catchall provision in the Homeless Assistance Act allowing HUD to impose conditions to improve the efficiency of grant administration confers expansive authority to implement the CoC Immigration Enforcement, Immigration Verification, Gender Ideology, and Abortion Conditions. But to apply that provision as the Federal Agencies suggest would exceed statutory limits on HUD's power, violate basic statutory construction rules, and grant HUD essentially boundless power to condition grants. The district court correctly rejected this baseless argument.

Second, the district court correctly ruled the Federal Agencies' decision-making process was arbitrary and capricious under the APA. To pass muster, an agency must offer a reasonable, contemporaneous explanation demonstrating its action resulted from reasoned decision-making. In imposing the Conditions, the Federal Agencies provided no explanation, much less a reasonable one. And their post hoc justification for some Conditions—essentially, "the President made us do it"—is too little, too late.

This Court has discretion to affirm for additional reasons supported by the record that the district court did not reach. The Conditions exceed even Congress's

21

power to condition federal funds under the Spending Clause because they impose obligations unrelated to the CoC and DOT grant programs' purposes and are ambiguous. The DOT Discrimination Condition also exceeds Congress's spending authority by restricting all DOT funding and threatening severe FCA penalties to coerce Local Governments into eliminating DEI initiatives, whether paid for with federal funds or not. Further, even if the CoC Conditions were otherwise legal (which they are not), they violate the APA because HUD failed to include them in the NOFO, as required by HUD's own regulations. For each of these reasons, the Local Governments are likely to succeed on the merits.

The district court also did not abuse its discretion in resolving the remaining preliminary injunction factors in the Local Governments' favor. The Local Governments are likely to face irreparable harm absent preliminary relief due to the Hobson's choice between accepting unlawful Conditions or risking the loss of critical homelessness assistance and transportation funding. These harms, and the unlawfulness of the Conditions, strongly weigh in favor of preliminary relief. On the other side, the Federal Agencies have no legitimate interest in imposing unlawful conditions on congressionally appropriated funds.

Accordingly, this Court should affirm the preliminary injunction in full. But at minimum, the injunction should be affirmed as to the DOT Immigration Enforcement Condition, the DOT EO Condition, and the CoC EO Condition,

because the Federal Agencies either do not appeal or fail to challenge in their opening brief the injunction as applied to those Conditions.

## VII.    ARGUMENT

### A.    The Local Governments Are Likely to Succeed on the Merits.

#### 1. The District Court Correctly Ruled Congress Has Not Authorized the Challenged Conditions.

No statute confers upon the Federal Agencies authority to impose the challenged Conditions. The court did not abuse its discretion in ruling the Local Governments are likely to prevail on their claims that the Federal Agencies are acting contrary to constitutional separation of powers principles and without statutory authority in violation of the APA, 5 U.S.C. § 706(2)(B), (C). The Federal Agencies' post hoc attempt to concoct statutory authority where none exists fails.

Only Congress has the power to "attach conditions on the receipt of federal funds." *City & Cnty. of San Francisco v. Trump* (*San Francisco*), 897 F.3d 1225, 1232 (9th Cir. 2018) (cleaned up); *see also id.* at 1231 ("The United States Constitution exclusively grants the power of the purse to Congress, not the President."). This power is "directly linked to [Congress's] power to legislate." *Id.* at 1231. By contrast, "[t]here is no provision in the Constitution that authorizes the President"—much less federal agencies—"to enact," "amend," or "repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see also San Francisco*, 897 F.3d at 1234 (President lacks "his own constitutional powers" when it comes to

23

spending (cleaned up)). Thus, "[a]bsent congressional authorization," agencies "may not redistribute or withhold properly appropriated funds" to "effectuate [their] own policy goals." *San Francisco*, 897 F.3d at 1235. Indeed, when an agency is tasked with administering a federal program, "[b]oth [its] power to act and **how** [**it is**] to act [are] authoritatively prescribed by Congress . . . ." *City of Arlington v. F.C.C.*, 569 U.S. 290, 297 (2013) (emphasis added). Stated simply: "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986).

The Federal Agencies do not dispute these bedrock principles. Nor do they (or could they) contend the executive orders the Conditions seek to implement can confer the required congressional authority. The Federal Agencies instead invoke an existing federal nondiscrimination statute and a limited catchall provision of the Homeless Assistance Act to conjure the necessary authority. Neither provision, nor any other statute, authorizes the Conditions here.

### a. Title VI Does Not Authorize the Discrimination Conditions.

The Federal Agencies first claim the CoC and DOT Discrimination Conditions are authorized by Title VI, which prohibits discrimination "on the ground of race, color, or national origin" in "any program or activity receiving Federal

24

financial assistance."[11] 42 U.S.C. § 2000d. They insist the Discrimination Conditions simply mirror nondiscrimination certifications recipients have long executed, albeit with a special emphasis on DEI. Op. Br. at 16–18. But the Federal Agencies ignore—and, importantly, do not disclaim—the extensive record demonstrating their intent to use these Conditions, combined with the poison pill of FCA enforcement, to coerce compliance with a novel and legally unsupported anti-DEI agenda. The district court rightly rejected the Federal Agencies' invitation to don judicial blinders and ignore this context. Instead, the court accurately described the conditions as "prohibitions on DEI initiatives," and ruled that no statute authorizes them. ER-36, -39.

The district court's determination is amply supported. To begin, the Federal Agencies do not dispute the Discrimination Conditions implement the DEI Order, which directs agency heads to include in grant awards terms materially the same as those at issue here. DEI Order § 3(b)(iv). The DEI Order purports to apply federal nondiscrimination law, stating that "[i]llegal DEI and DEIA policies . . . violate the text and spirit of our longstanding Federal civil-rights laws" and "undermine our national unity." *Id.* § 1. But the policy it announces reflects an unprecedented and

---

[11] The Federal Agencies do not contend the Homeless Assistance Act or any of the statutes establishing DOT grant programs authorize the CoC or DOT Discrimination Conditions. As the district court explained, those statutes establish specific conditions on the use of federal funds, none of which relate to prohibiting DEI. ER-36–39.

unsupported legal interpretation that would prohibit DEI in nearly all forms. For instance, the DEI Order directs the Director of the Office of Management and Budget ("OMB") to "[e]xcise" mere "**references** to DEI and DEIA principles, under **whatever** name," from federal grants for the stated purpose of "comply[ing] with civil-rights laws" (among other reasons). *Id.* § 3(c)(ii) (emphasis added). It also directs the OMB Director to "[t]erminate **all**" programs related to "diversity," "equity," "equitable decision-making," or "advancing equity," as "appropriate," without regard to whether the programs actually violate federal law. *Id.* § 3(c)(iii) (emphasis added).

Subsequent agency statements demonstrate how the Federal Agencies plan to enforce the Discrimination Conditions. The Blanche Memo asserts that recipients could violate the FCA by certifying compliance with nondiscrimination law while allowing transgender individuals to use bathrooms consistent with their gender identities. 5-SER-1180. Tellingly, the Blanche Memo cites no authority for this position—which in fact conflicts with case law holding that **excluding** transgender individuals violates nondiscrimination law. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–19 (4th Cir. 2020) (transgender student's exclusion from bathroom violated Title IX of the Education Amendments Act of 1972); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023) (same). Even where courts have taken a contrary view, the decisions merely hold that segregating

facilities based on sex-assigned-at-birth does not violate Title IX. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812–15 (11th Cir. 2022) (en banc). To the Local Governments' knowledge, no authority supports the Blanche Memo's assertion that federal nondiscrimination law **prohibits** transgender inclusion.[12]

Then, the Blanche Memo announces a new initiative to "utilize the [FCA] to investigate and . . . pursue claims against any recipient of federal funds that knowingly violates federal civil rights laws." 5-SER-1181. And it "strongly encourages" private litigants to bring FCA suits on behalf of the government, *see* 31 U.S.C. § 3730(b), heightening the risk for recipients that maintain DEI programs. 5-SER-1181. Against this backdrop, the Federal Agencies' insistence that the Discrimination Conditions simply call attention to "pre-existing obligation[s]" rings hollow. Op. Br. at 16.

Indeed, HUD's and DOT's recent communications to grant recipients are consistent with the Administration's campaign to force broad abandonment of DEI initiatives, untethered to existing federal nondiscrimination law. The Duffy Letter to

---

[12] Similarly, the Blanche Memo defines the scope of allegedly unlawful conduct broadly enough to potentially encompass affinity groups, 5-SER-1180, contrary to case law. *See e.g.*, *Diemert v. City of Seattle*, 776 F. Supp. 3d 922, 932, 949–51 (W.D. Wash. 2025) (affinity groups "open to any City employee" did not violate equal protection); *Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 540–42 (7th Cir. 2005) (affinity groups based on common social identity, but not religion, did not violate Title VII).

all DOT funding recipients warned that DOT considers "discriminatory policies or practices designed to achieve so-called '[DEI]' . . . goals" to "presumptively violate[] Federal law," even when "described in neutral terms." 9-SER-2055. Similarly, Secretary Turner announced that HUD "is carrying out President Trump's executive orders, mission, and agenda," by "[a]lign[ing] all . . . grant agreements with the President's Executive Orders, removing [DEI]." Press Release, HUD, *supra* at 10. He also posted on X that "CoC funds . . . will not promote DEI." Scott Turner Post, *supra* at 10.

The Federal Agencies' expansive reinterpretation of nondiscrimination law is especially clear when contrasted with the prior long-standing interpretation reflected in their regulations. The Discrimination Conditions contradict both HUD's and DOT's Title VI regulations, which expressly permit—and, in some instances require—equity and inclusion initiatives. For instance, both agencies' regulations state they "do[] not prohibit the consideration of race, color, or national origin" to "overcome the consequences" of past discrimination in federal programs, and require recipients to take "affirmative action" to "overcome" such "effects." 49 C.F.R. § 21.5(b)(7); 24 C.F.R. § 1.4(b)(6)(i). Absent past discrimination, the regulations state that recipients "**should** take affirmative action" to overcome conditions that resulted in "limiting participation by persons of a particular race, color, or national origin." 24 C.F.R. § 1.4(b)(6)(ii) (emphasis added); 49 C.F.R.

§ 21.5(b)(7) (similar). The Federal Agencies' claim that the Discrimination Conditions "are plainly lawful" under these regulations thus finds no support in their plain text. Op. Br. at 18.

The Federal Agencies also cite the Fourth Circuit's stay order in a lawsuit challenging the DEI Order and another executive order as support for their claim that the Discrimination Conditions simply require compliance with existing nondiscrimination law. *See* Order Granting Defendants' Motion for a Stay Pending Appeal, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025), https://www.thompsoncoburn.com/wp-content/uploads/2025/03/National-Assoc.-of-Diversity-Officers-v.-Trump-Stay-03142025.pdf. But there, the court addressed a pre-enforcement facial challenge to the executive orders on free speech and vagueness grounds and did not consider specific grant conditions or agency authority to implement the DEI Order through such conditions. *Id.* at 2–3, 7. In fact, two of the three judges "reserve[d] judgment on how the administration enforces the[] executive orders . . . ." *Id.* at 4 n.1 (Diaz, C.J. concurring); *see also id.* at 7 (Harris, J. concurring) ("What the Orders say on their face and how they are enforced are two different things."). By contrast, here the specific Conditions and agency proclamations demonstrate that the Federal Agencies are **presently** seeking to enforce their unsupported reinterpretation of nondiscrimination law.

29

Finally, the Federal Agencies claim that requiring recipients to certify the Discrimination Conditions' materiality for FCA purposes "adds nothing to recipients' obligations." Op. Br. at 19. But the law is exactly opposite. Establishing FCA liability requires a showing **by the federal government** that an alleged misrepresentation was "material to the Government's payment decision"—a "demanding" requirement. *Escobar*, 579 U.S at 192, 194. It is not enough for the government to "merely . . . designate[] compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Id.* at 194; *see also Kousisis v. United States*, 145 S. Ct. 1382, 1404 (2025) (Thomas, J., concurring) (the materiality inquiry "turns on substance rather than labels"). The Federal Agencies' contention that it is "unremarkable" to require recipients to agree to materiality—an otherwise "demanding" element of an FCA claim—is nonsensical, especially given the Administration's explicit threat of FCA enforcement. *See* 5-SER-1180–1181.

In sum, the district court properly declined to analyze the Discrimination Conditions in a silo and instead credited the extensive record demonstrating the Conditions are an overt effort to force federal grant recipients to eliminate all DEI policies and programs—even those unrelated to use of the funds at issue—pursuant to the Administration's novel and unsupported reinterpretation of the law. This Court

30

should affirm the district court's amply supported determination that the Federal Agencies lack statutory authority to condition CoC and DOT grants in this way.

### b. Section 11386(b)(8) Does Not Authorize the Other CoC Conditions.

With respect to the CoC Immigration Enforcement, Immigration Verification, Gender Ideology, and Abortion Conditions,[13] the Federal Agencies cite as purported statutory authority a single, generic catchall provision of the Homeless Assistance Act that prohibits the HUD Secretary from "provid[ing] assistance" unless a CoC applicant agrees, among other things, "to comply with such other terms and conditions as the Secretary may establish to carry out [the CoC program] in an effective and efficient manner." 42 U.S.C. § 11386(b)(8). At the district court, the Federal Agencies never "argued that this provision confers the authority to impose the [CoC] conditions" or even "attempted to explain . . . how the proposed funding conditions . . . fall within th[e] catchall provision." ER-36. Their belated effort to do so now fails.

The Federal Agencies claim section 11386(b)(8) confers "broad authority to impose a range of conditions . . . from the ministerial to the substantive . . . ." Op. Br. at 22. But while they concede such conditions must be "designed to enhance the program's efficiency and effectiveness," *id.*, they ignore the purposes Congress set

---

[13] While the Federal Agencies' Section 11386(b)(8) argument refers generally to the "remaining" CoC Conditions, they do not address the CoC EO Condition. Op. Br. at 20.

31

for the program and claim this provision essentially grants HUD unlimited power to condition funds. To merely assert that "prohibiting recipients from using grant funds for [certain] purposes . . . ensure[s] that grant funds are used effectively and efficiently," *id.* at 21, does nothing to show the Conditions even plausibly enhance the provision of homelessness assistance. Under that circular reasoning, if grant conditions limit the use of funds in **some** way (as all conditions do), the HUD Secretary may unilaterally deem them necessary to "carry out [the CoC program] in an effective and efficient manner," regardless of whether they further the purposes Congress expressly identified. This unbounded assertion of power does not withstand even minimal scrutiny.

First, the President's power to impose conditions through executive fiat contrary to "the expressed . . . will of Congress" is "at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Here, the Federal Agencies' construction of section 11386(b)(8) violates express limits on HUD's power. In enacting the Cranston-Gonzalez National Affordable Housing Act—which, among other things, authorizes the HUD Secretary to provide grants to local governments to remove regulatory barriers to affordable housing, *see* 42 U.S.C. § 12705c—Congress sought to "[p]rotect[] . . . State and local authority":

> Notwithstanding any other provision of this subchapter or subchapter II, the [HUD] Secretary shall not establish any criteria for allocating or denying funds made available under programs administered by the Secretary based on the adoption, continuation, or discontinuation by a

32

> jurisdiction of any public policy, regulation, or law that is (1) adopted, continued, or discontinued in accordance with the jurisdiction's duly established authority, and (2) not in violation of any Federal law.

42 U.S.C. § 12711. In other words, "HUD may not . . . condition funding on changes to local policies . . . ." *Cnty. of Westchester v. U.S. Dep't of Hous. and Urban Dev.*, 802 F.3d 413, 433 (2d Cir. 2015) (emphasis omitted). The CoC Conditions do exactly that: attempt to force local jurisdictions to abandon lawful policies disfavored by the Administration or else forfeit CoC funds.

Second, the Federal Agencies' broad reading of section 11386(b)(8) flouts basic statutory interpretation principles. Congress "rarely accomplishe[s]" "[e]xtraordinary grants of regulatory authority" through "modest words, vague terms, or subtle devices." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (cleaned up). Had Congress intended to "alter the fundamental details of" the CoC program by authorizing the HUD Secretary to impose grant conditions unrelated to the program's statutory purposes, it would not have done so in an "ancillary provision[]" that, on its face, **limits** the Secretary's power. *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001); *see* 42 U.S.C. § 11386(b) ("The Secretary **may not** provide assistance . . . **unless** the [CoC applicant] agrees [to enumerated conditions]." (emphasis added)). Indeed, the Supreme Court recently made clear that major questions of "economic and political significance" require an explicit congressional delegation of authority. *Biden v. Nebraska*, 600 U.S. 477, 502, 504–

33

06 (2023) (cleaned up). Such questions include an agency's claim of authority to "unilaterally alter" millions of dollars in congressionally authorized grants based on its views of hotly contested policy issues on which Congress has not spoken. *See id.* at 502, 507.

Inferring such broad authority from section 11386(b)(8) is even less plausible in the context of federal spending legislation. *See Whitman*, 531 U.S. at 468 ("[Congress] does not, one might say, hide elephants in mouseholes."). The Spending Clause vests "exclusive power" in Congress "to impose conditions on federal grants," *San Francisco*, 897 F.3d at 1231, but requires that such "conditions must be set out unambiguously," *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (cleaned up). To accept the Federal Agencies' construction would require finding that section 11386(b)(8) unambiguously confers authority that would all but erase Congress's exclusive role in setting the purposes to be advanced by CoC spending. No reasonable reading supports that result. And the Federal Agencies' new and unbridled conception of their own authority to enact conditions on congressionally authorized funding is entitled to no deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 399, 412 (2024) (instructing federal courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority").

Cannons of statutory construction further refute the Federal Agencies' position. Under the canon of *ejusdem generis*, "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (cleaned up). The related canon of *noscitur a sociis* provides that a word is "given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). Here, section 11386(b)(8) appears in a list of "required agreements" by each CoC recipient. For instance, recipients must agree to operate CoC-funded projects in accordance with CoC program statutes, to monitor and report on progress, to involve homeless individuals in their projects, and to place families with children in shelters as close as possible to their schools. *See* 42 U.S.C. § 11386(b)(1)–(4), (7). The required agreements in section 11386(b) relate directly to the statutory purposes Congress established for the CoC program. *See* 42 U.S.C. § 11381. The requirement to house families with children near their schools, for instance, helps to "minimiz[e] the trauma and dislocation caused . . . by homelessness." *Id.* Similarly, involving homeless individuals in CoC projects through employment or volunteer opportunities advances the purpose of "optimiz[ing] self-sufficiency." *Id.* And the various transparency and accountability

requirements promote "effective utilization of" mainstream programs and "community-wide commitment to . . . ending homelessness." *Id.*

Under the canons above, the meaning and breadth of section 11386(b)(8) is informed by the other required agreements in section 11386(b)—none of which concern eliminating DEI, immigration enforcement or verification, or prohibiting "promotion" of "gender ideology" or "elective abortion." 42 U.S.C. § 11386(b)(1)–(7). Thus, interpreting section 11386(b)(8)'s catchall provision to authorize the CoC Conditions here finds no support in the remainder of the statute.

Third, the Federal Agencies' belated attempt to tie the CoC Conditions to statutory purposes falls flat. To the extent they suggest the Conditions simply prohibit uses of funds unrelated to homelessness services, *see* Op. Br. at 21, they ignore that the Conditions would **limit** CoC recipients' ability to provide—and **exclude** vulnerable individuals from receiving—such services. *See supra* Section IV.B.1 (CoC Conditions purport to dictate whether CoC providers recognize gender identity, have inclusive policies, or "promote" certain types of abortions). Next, their claim that section 11386(b)(8) provides "broad authority" to impose "substantive" conditions simply because some of the enumerated items "implicate policy choices," Op. Br. at 21–22, conflates the role of Congress with that of the Executive. Even if section 11386(b)'s list of required agreements reflects congressional "policy

36

choices," it does not follow that Congress authorized HUD to advance its **own** policy choices (or the President's), rather than Congress's.

The Federal Agencies next claim the CoC Conditions "largely track restrictions on CoC funds" set forth in PRWORA and the Hyde Amendment. Op. Br. at 22. But where Congress has addressed immigration status verification or abortion, it has declined to restrict funds in the way HUD seeks to accomplish.

In PRWORA, Congress expressly tasked the U.S. Attorney General—not local governments—with creating an immigration status verification requirement through a final regulation. Thus, while PRWORA limits eligibility for certain "Federal public benefit[s]," 8 U.S.C. § 1611(a), it does not require grant recipients to verify eligibility **unless** the Attorney General promulgates regulations implementing such a requirement, *id.* § 1642(a). And if the Attorney General does so, PRWORA gives recipients a two-year period to comply. *Id.* § 1642(b).

While the Attorney General issued interim guidance and a proposed verification rule in the 1990s, a final rule was never adopted. *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997); Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998) (proposed rule). Without a final rule, the interim guidance remains in place, which requires only examination of identity and

37

immigration documentation. *See* 62 Fed. Reg. at 61348–49. Indeed, many of the Local Governments lack access to the SAVE system—which HUD now seeks to mandate—and would have to bear the expense of establishing an equivalent system. 7-SER-1506 ¶ 9; 7-SER-1597 ¶ 10; 7-SER-1617 ¶ 22; 7-SER-1647 ¶ 14. No plausible reading of section 11386(b)(8) permits HUD to contradict the scheme Congress enacted by shifting the onus of devising a verification system onto local governments and eliminating the two-year compliance period.[14]

Similarly, the Federal Agencies' claim that the Hyde Amendment "already prohibits" use of CoC funds to "promote elective abortions," Op. Br. at 23, is false. The Hyde Amendment prohibits use of federal funds to pay for or require a person to facilitate an abortion, but does not prohibit "promot[ing] elective abortions." *See* Consolidated Appropriations Act, 2024, §§ 202–03, 138 Stat. at 153; *see also supra* Section IV.B.1. The Federal Agencies' attempt to unilaterally broaden the Hyde Amendment's reach under the guise of "carry[ing] out [the CoC program] in an effective and efficient manner," 42 U.S.C. § 11386(b)(8), underscores the extent to which they seek to sideline Congress.

Nor does the CoC Gender Ideology Condition "follow[] from the [Homeless] Assistance Act," as the Federal Agencies claim. Op. Br. at 23–24. That the Act does

---

[14] The Federal Agencies do not argue PRWORA authorizes the CoC Immigration Enforcement Condition despite the Immigration Order's apparent assertion that it does. *See* Immigration Order § 2(a).

not expressly permit "promotion" of "gender ideology" is not the relevant question. If agencies could prohibit the use of funds for any activity not expressly delineated in the authorizing statute, their power to thwart Congress's will would be limitless. Rather, the question is whether Congress has authorized the condition at issue. *See supra* at 23–24. Nothing in the Homeless Assistance Act does so.

In sum, the district court correctly determined that neither Title VI, nor the Homeless Assistance Act, nor any other statute authorizes the Federal Agencies to leverage congressionally authorized funds to advance a political agenda unrelated to homelessness assistance or public transportation.

### 2. The District Court Correctly Ruled the Federal Agencies' Actions Are Arbitrary and Capricious.

The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A). To withstand scrutiny, an agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not intended it to consider," nor simply ignore "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983). While agencies have discretion to change their existing policies, they must "display awareness that they are doing so, provide "good reasons for the new policy," and take into account "serious reliance interests." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, the district court properly ruled the Federal Agencies "have failed

39

to demonstrate that the new funding conditions were the result of 'reasoned decisionmaking,' let alone have been 'reasonably explained,'" and, thus, their "insistence on the new funding conditions was arbitrary and capricious." ER-40; *see also Ohio v. EPA*, 603 U.S. 279, 292 (2024) (agency action is arbitrary or capricious "if it is not reasonable and reasonably explained" (cleaned up)); *Barton v. Office of Navajo*, 125 F.4th 978, 982 (9th Cir. 2025) (similar).

As a threshold matter, the district court correctly ruled this is not one of the "rare instances" where an agency action is unreviewable because it is committed to agency discretion by law. ER-29 (quoting *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015)). The court properly rejected the Federal Agencies' reliance on *Lincoln v. Vigil*, 508 U.S. 182 (1993), which involved an agency's decision to cancel a discretionary program funded from a single lump-sum appropriation that covered all of the agency's activities. ER-30. By contrast, Congress provided detailed legal standards for the grant programs at issue here, against which the Federal Agencies' unlawful actions are readily reviewable. They do not meaningfully contest this on appeal. *See* Op. Br. 25.

Turning to the merits, "an agency must defend its actions based on the reasons it gave when it acted, not with post hoc rationalizations." *Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*, 73 F.4th 657, 668 (9th Cir. 2023) (cleaned up). Starting

with HUD, no contemporaneous explanation was given for any of the CoC Conditions. Those Conditions are arbitrary and capricious for this reason alone.

Even after the fact, HUD has failed to provide any reasonable explanation. The Turner Letter states only that HUD imposed the CoC Immigration Enforcement and Verification Conditions because the President ordered HUD to do so. *See* 7-SER-1669 (describing HUD Secretary's "responsibility to effectively implement the" Immigration Order and informing recipients that "HUD senior leadership" review would "ensure that HUD programs are compliant with" that order). But "an executive order is not 'law,'" *California v. EPA*, 72 F.4th 308, 318 (D.C. Cir. 2023), and complying with an executive order neither exempts the agency from the "reasoning, deliberation, and process" required by the APA, nor permits it to "flip-flop . . . on the whims of each new administration," *California v. Bernhardt*, 472 F. Supp. 3d 573, 600–01 (N.D. Cal. 2020), *appeal docketed*, No. 20-16801 (9th Cir. Sept. 17, 2020).

The Turner Letter does not address HUD's decision to require recipients to verify program participants' immigration status using SAVE or an equivalent system despite the Attorney General's failure to adopt regulations implementing such a requirement with a two-year compliance period as PRWORA requires. *See supra* at 37–38. Nor does HUD demonstrate consideration of the programmatic impacts likely to result if recipients are required to do so. HUD may not ignore these key

"aspect[s] of the problem," *State Farm*, 463 U.S. at 43, simply because the President ordered it. *See California*, 472 F. Supp. 3d at 600–01, 605 (agency's action based on executive order did not excuse it from explaining change in policy). The Turner Letter also fails to address conflicts between the CoC Conditions and HUD's regulations, including a regulation mandating "[e]qual access" to CoC programs in accordance with participants' "gender identity." 24 C.F.R. § 5.106(b)–(c).

The DOT Conditions are no better supported. Similar to the Turner Letter, the Duffy Letter merely parrots the executive orders and cites no authority supporting the DOT Conditions. 9-SER-2054–2057. It simply asserts that DEI policies "presumptively violate[]" the law, 9-SER-2055, while failing to acknowledge that this view departs from case authority and DOT's own prior view of the law as reflected in agency regulations, *see supra* Section VII.A.1.a.[15]

The Duffy Letter also purports to justify the DOT Discrimination Condition on the basis that DOT "must ensure that discrimination based on [protected characteristics] does not exist in the programs or activities it funds." 9-SER-2055. But this is inconsistent with the Condition, which apparently requires the recipient to certify it does not operate **any** DEI program DOT deems prohibited—whether

---

[15] DOT added the DOT Discrimination Condition to some DOT Agreements before explaining how DOT plans to enforce that condition under its reinterpretation of federal nondiscrimination law. At least one of the Local Governments had already signed such an agreement with a different understanding of that Condition and the law. 1-SER-71 ¶ 22.

federally funded or not. Nor does the Duffy Letter explain how the Local Governments could comply with the DOT Discrimination Condition while also complying with existing statutory and regulatory requirements. *See, e.g.*, Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 11101(e), 135 Stat. 429, 448–50 (Nov. 15, 2021) (re-authorizing DOT's disadvantaged business enterprise program); *id.* § 25005(d)(3)(B)(iv), 135 Stat. at 842 (DOT Secretary must prioritize SMART grant applications for projects that would "promote a skilled workforce . . . inclusive of minority or disadvantaged groups"); *id.* § 24112(d)(3)(E), 135 Stat. at 816 (considerations for certain FHWA grants include extent to which project will ensure "equitable investment in the safety needs of underserved communities" in preventing transportation-related harms).

The Federal Agencies' only defense—that "the rationale for the conditions is self-evident on their face," Op. Br. 25—is based on a misstatement of the law. They claim "an agency's determination must be upheld if 'its path may reasonably be discerned.'" *Id.* (quoting *City of Los Angeles*, 929 F.3d at 1181). But this Court's full quote in *City of Los Angeles* requires more: an "agency satisfies [arbitrary and capricious review] **when the agency's explanation is clear enough** that its path may reasonably be discerned." 929 F.3d at 1181 (cleaned up; emphasis added). Here, the Federal Agencies provided no explanation at all, much less a clear one. For these

43

reasons, the district court correctly ruled that imposing the CoC and DOT Conditions was arbitrary and capricious.

### 3. The Local Governments Are Likely to Succeed on the Merits of Their Spending Clause and Procedural APA Claims.

The Local Governments demonstrated below that the challenged Conditions likely violate the Spending Clause, and that HUD violated the APA by failing to adhere to its own regulations. Although the district court did not reach these claims, ER-40–41 n.19, this Court may affirm on those bases. *Enyart*, 630 F.3d at 1159.

### a. The Conditions Exceed Even Congress's Spending Power.

Even if Congress had authorized the CoC and DOT Conditions, they exceed Congress's power under the Spending Clause.

First, when Congress attaches conditions to federal funds, it must do so "unambiguously" so jurisdictions "can knowingly decide whether or not to accept those funds." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 24–25 (1981). All of the Conditions fail this test. For instance, the Discrimination Conditions inject ambiguity into compliance with federal law by reinterpreting nondiscrimination law in ways counter to judicial precedent. *See supra* Section VII.A.1.a. And the CoC Immigration Enforcement Condition offers no criteria for

identifying proscribed "policies that seek to shield illegal aliens from deportation," or for determining when funding has the "effect" of "abet[ting]" such policies.[16]

The CoC Conditions also fail to explain what it means to "promote" "gender ideology" and "elective abortion." The description of "gender ideology" adopted in the CoC Gender Ideology Condition is not only demeaning, but also idiosyncratic and unscientific. Similarly, the phrase "elective abortion" in the CoC Abortion Condition has no scientific or legal meaning. Unable to derive their obligations from these Conditions' text or rely on court decisions interpreting federal law, the Local Governments cannot "ascertain what is expected of [them]," as required to pass muster under the Spending Clause. *Pennhurst*, 451 U.S. at 17.

Second, the Spending Clause requires that congressionally imposed conditions on federal funding be germane "to the federal interest in [the] particular" program. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (cleaned up). Here, the CoC and DOT Conditions are unlawful because they are entirely unrelated to homelessness and transportation funding. None of the authorizing statutes have any nexus to eliminating DEI, enforcing federal immigration law, or prohibiting promotion of "gender ideology" or abortion. *See supra* Section VII.A.1.

---

[16] It is unclear, for example, if the CoC Immigration Enforcement Condition requires CoC providers to ask participants about immigration status, share information with immigration authorities, or provide federal authorities with access to facilities.

Third, Congress cannot compel local jurisdictions to adopt policies by offering a "financial inducement . . . so coercive as to pass the point at which pressure turns into compulsion." *Dole*, 483 U.S. at 211 (cleaned up). The DOT Discrimination Condition violates this restriction by threatening to restrict **all** DOT funding unless the Local Governments eliminate **all** forms of DEI across **all** of their operations, whether federally funded or not. The Local Governments' DOT grants represent a significant portion of their budgets, and they do not have alternative sources to fill that gap. *See, e.g.*, 1-SER-77 ¶ 9 (San Francisco to receive $2 billion in DOT grants); 3-SER-699–700 ¶ 20 (DOT grants comprise ten to fifteen percent of Culver City's operating and capital budgets). At a time when many of the Local Governments are struggling to recover from pandemic-related financial impacts, *see, e.g.*, 1-SER-65 ¶ 5 (San Francisco), the restriction of all DOT funding "is much more than relatively mild encouragement—it is a gun to the head." *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 581 (2012) (opinion of Roberts, C.J.).

The coercion does not end there. The DOT Discrimination Condition requires the Local Governments to agree that their compliance with nondiscrimination law is "material" for purposes of the FCA—an essential element of an FCA claim. The risk of treble damages from an FCA enforcement action could be ruinous. The Deputy Attorney General's new initiative to utilize the FCA against entities that engage in purportedly "unlawful discrimination," *see supra* at 10, 26–27, only heightens the

risk. These threats constitute "economic dragooning that leaves [the Local Governments] with no real option but to acquiesce" to federal dictates. *NFIB*, 567 U.S. at 582.

Because the CoC and DOT Conditions exceed even Congress's spending power, they are unlawful.

### b. HUD Failed to Follow Its Own Regulations.

Under the APA, an agency must "abide by its own regulations." *Fort Stewart Schs. v. Fed. Labor Rels. Auth.*, 495 U.S. 641, 654 (1990); *see also* 5 U.S.C. § 706(2)(A), (D) (requiring courts "hold unlawful" agency actions "not in accordance with law" or done "without observance of procedure required by law"). When an agency "chooses to bind itself to published procedures," it must then "exercise its own discretion in accordance with its own existing valid regulations and binding precedents." *Castaneira v. Noem*, 138 F.4th 540, 551 (D.C. Cir. 2025) (cleaned up). Even if the CoC Conditions were otherwise lawful (which they are not), HUD violated the APA by failing to observe its own required procedures in imposing them.

HUD's regulations implementing the CoC program set forth specific grant conditions that track the statutory language and/or closely relate to program administration. *See* 24 C.F.R. § 578.23(c). The regulations allow for "other terms and conditions" only if "establish[ed] by" the NOFO. *Id.* § 578.23(c)(12). None of

the CoC Conditions is contained within HUD's regulations, nor was any included in the relevant NOFO. To the contrary, the NOFO required applicants to explain how they would "advance racial equity" and address "the needs of LGBTQ+ individuals." *See supra* note 2. Thus, the CoC Conditions are unlawful under HUD's regulations.

In sum, for any or all of the reasons above, this Court should affirm the district court's ruling that the Local Governments are likely to succeed on the merits.

## B. The District Court Properly Determined the Local Governments Will Suffer Irreparable Harm if the Conditions Are Not Enjoined.

The district court did not abuse its discretion in determining, based on the extensive record, that the Local Governments will suffer multiple harms "quintessentially irreparable in nature" absent injunctive relief. ER-46. Based on federally imposed deadlines and program obligations, the Local Governments have faced and continue to face the impossible decision either to accept unlawful Conditions or risk losing billions in federal funding for vital public services. That circumstance itself constitutes irreparable harm. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057–58 (9th Cir. 2009) (plaintiffs faced irreparable harm from "Hobson's choice" of refusing to sign "likely unconstitutional" agreements, thus losing goodwill and business, or "sign[ing] an agreement to conditions which are likely unconstitutional"); *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." (cleaned up));

48

*see also, e.g.,* 5-SER-1048 ¶ 37 (describing Bend's "untenable choice" to "violate state law and our City's existing commitments, or lose access to more than $40 million in funding").

As the district court found, loss of CoC and DOT funds will result in immediate, irreparable, and reverberating harms to the Local Governments, their operations, and their communities, including upending their budgets, cutting off critical homelessness services, curtailing existing and planned transportation projects, and forcing layoffs and diversion of resources from other public services. ER-44; *see also, e.g.*, SER-8-SER-17015 ¶ 17; 7-SER-1649 ¶ 20; 7-SER-1617–1618 ¶ 26; 7-SER-1477 ¶ 31; 7-SER-1435–1436 ¶ 21; 6-SER-1397–1398 ¶¶ 19, 21; 5-SER-1044, -1047 ¶¶ 27–28, 36; 2-SER-439 ¶ 19; 1-SER-162–163 ¶ 26; 1-SER-119, -121–122 ¶¶ 10–12, 18–19; 1-SER-83–84 ¶¶ 15–16; 1-SER-70–71 ¶¶ 14, 18; 1-SER-54–55 ¶¶ 20–23; 1-SER-31–32 ¶¶ 28–29. Many of these harms are non-economic, and for those that are (such as increased project costs due to delay; financial uncertainty due to confusion regarding applicability of Conditions), monetary damages are unavailable. *See Washington v. Trump*, No. 25-807, 2025 WL 2061447, at *15 (9th Cir. Jul. 23, 2025) ("economic harm is irreparable when monetary damages are unavailable"); *see also*, *e.g.*, *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal 2017) (uncertainty arising from executive order

49

irreparably harmed counties by interfering with their ability to "budget, plan for the future, and properly serve their residents").

Citing *Dalton v. Specter*, 511 U.S. 462 (1994), the Federal Agencies argue that "even if [the Local Governments] are correct on the merits of their statutory arguments, they would not have suffered a constitutional injury." Op. Br. at 26. As a preliminary matter, the Federal Agencies raise this argument for the first time on appeal, and the Court should decline to consider it. *See Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 546 n.15 (9th Cir. 1991) ("It is well established that an appellate court will not reverse a district court on the basis of a theory that was not raised below."); *United States v. Carlson*, 900 F.2d 1346, 1349 (9th Cir. 1990) (noting "general rule" that "we will not consider issues raised for the first time on appeal"). Moreover, *Dalton* did not address the Spending Clause, and therefore does nothing to undermine the Local Governments' showing of constitutional injury. *See supra* Section VII.A.3.a.

Further, the Federal Agencies ignore that the district court found more than merely a statutory violation: it found the Local Governments "are likely to succeed in demonstrating that the new funding conditions . . . are contrary to the Constitution's Separation of Powers doctrine." ER-42; *see also* ER-37, -39, -41. The Federal Agencies do not and cannot dispute that deprivation of constitutional rights

50

constitutes irreparable injury. *See Hernandez*, 872 F.3d at 994; *Am. Trucking Ass'ns, Inc.*, 559 F.3d at 1057–59.

To the extent the Federal Agencies contend *Dalton* precludes any such constitutional claim because it is grounded in an allegation that the Federal Agencies exceeded their statutory authority, they overstate *Dalton*'s holding, mischaracterize the Local Governments' challenge, and ignore this Court's precedent. *Dalton* involved a challenge to the President's discretionary decision to accept an independent commission's military base closure recommendation under the Defense Base Closure and Realignment Act of 1990. 511 U.S. at 464–66. The Supreme Court rejected the plaintiff's statutory challenge on the grounds the statute at issue gave the President unfettered discretion. *Id*. at 474-76. The Court also rejected the claim the President acted unconstitutionally simply because he had allegedly violated the statute, explaining that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id*. at 472. But the Court did not hold or imply that action taken without statutory authority can **never** give rise to a constitutional injury. To the contrary, *Dalton* distinguished between a claim that the President acted in a "conceded absence of any statutory authority" and "a claim that the President acted in excess of such authority." *Id*. at 473 (emphasis omitted). The Court ultimately concluded "longstanding authority holds that [judicial] review is not available when

51

the statute in question commits the decision to the discretion of the President." *Id*. at 474.

Here, no such discretionary delegation exists. The federal spending power lies exclusively with Congress. Federal agencies must respect statutory grant purposes and do not retain discretion to condition federal grants based on the Executive's political priorities—and in doing so, change the purposes Congress has enacted—absent a congressional delegation of such authority. Thus, unlike in *Dalton*, here the Local Governments do not "simply alleg[e] that the [Executive] has exceeded [its] statutory authority," 511 U.S. at 473, but rather that the Federal Agencies have no power to usurp Congress's exclusive authority to condition federal funding in violation of the separation of powers. The Agencies have an absence of authority to do what they did here. As this Court's precedent makes clear, *Dalton* is inapposite under these circumstances. *See, e.g., Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023) ("Contemporary Ninth Circuit jurisprudence weighs in favor of justiciability by taking an expansive view of the constitutional category of claims highlighted in *Dalton*. . . . While an action taken by the President in excess of his statutory authority does not necessarily violate the Constitution, specific allegations regarding separation of powers may suffice." (cleaned up)), *cert. denied*, 144 S. Ct. 1111 (2024); *Newsom v. Trump*, 141 F.4th 1032, 1046–47 (9th Cir. 2025)

(distinguishing *Dalton* on the grounds that the statute at issue there "authorized unfettered discretion" by the President (cleaned up)).

A divided panel of the D.C. Circuit recently relied on *Dalton* in holding no "freestanding" constitutional separation of powers claim was cognizable where federal grant recipients alleged the President had violated the Impoundment Control Act in directing executive departments and agencies to freeze (impound) congressionally appropriated foreign aid funds. *Global Health Council v. Trump*, No. 25-5097, 2025 WL 2326021, at *6–9 (D.C. Cir. Aug. 13, 2025). That case has no bearing here. Notably, the majority acknowledged its decision creates a split with the Ninth Circuit, specifically this Court's "expansive view of the constitutional category of claims highlighted in *Dalton*" described in *Murphy*. *Id.* at *9 n.15. *Murphy* controls here. *See Hart v. Massanari*, 266 F.3d 1155, 1171–72 (9th Cir. 2001) (one three-judge panel of this Court cannot ordinarily reconsider or overrule a prior panel's decision). Regardless, *Global Health Council* is distinguishable. That case was a challenge to the President's authority to impound funds where Congress had enacted a procedure for doing exactly that. Here, the Federal Agencies are attempting unilaterally to change the purposes and policies enacted by Congress. That is a textbook separation of powers violation. *See, e.g.*, *San Francisco*, 897 F.3d at 1234–35 (holding executive order directing agencies to withhold appropriated funds violated separation of powers: "Absent congressional authorization, the

53

Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals."); *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) ("The Attorney General's use of extra-statutory conditions on federal grant awards as a tool to obtain compliance with his policy objectives strikes at the heart of . . . the separation of powers among the branches of the federal government."). No court to our knowledge has held a grantee did not have a right to assert a claim based on the separation of powers challenging the executive's assertion of power to alter or add to Congress's specific statutory authorization creating a funding program.

Further, the Federal Agencies' assertion that the Local Governments "have not explained, in concrete terms, how accepting the challenged conditions . . . would harm them while this litigation plays out," Op. Br. at 26, cannot be reconciled with the extensive record below. In addition to constitutional injuries (which are independently sufficient to show irreparable harm), the Local Governments also identified specific harms arising from the new and newly interpreted Conditions. *See, e.g.,* 7-SER-1647–1648 ¶¶ 14–16 ("These new [CoC] conditions are difficult, if not impossible, to meet."); 5-SER-1048–1049 ¶¶ 37–40.

For instance, the CoC Immigration Verification Condition would require Local Governments to use "local resources" to "gain access to [the SAVE] system, train their own employees how to use the system, and require them to enter

immigration information." ER-100; *see also, e.g.*, 7-SER-1506 ¶ 9 (San Francisco "has not been given access to SAVE"); 7-SER-1617 ¶ 22 (Pierce County) (same). The Local Governments are not aware of any relief available for these harms. *See Washington*, 2025 WL 2061447, at *15.

Similarly, the Discrimination Conditions place the Local Governments in an untenable position. Unbounded by existing law, it is unclear which DEI policies the Federal Agencies consider unlawful. *See, e.g.*, 8-SER-1718–1719 ¶ 23 ("It is not at all clear how an FTA grant recipient such as [King County] Metro can know what might constitute an 'illegal DEI or DEIA' policy, especially if it is something other than compliance with the existing federal nondiscrimination requirements already covered by the prior, existing language . . . ."); 5-SER-1049 ¶ 39 (lack of definition for DEI "makes it difficult, if not impossible, for Bend to know if it can or is complying with the DEI Condition"). The Federal Agencies' threat to pursue FCA enforcement amidst this cloud of uncertainty is a transparent attempt to coerce federal grant recipients into eliminating all DEI initiatives—lawful or not—or risk the burden of defending against such investigations and actions. Such anticipatory obedience would cause immeasurable and irremediable harms to the Local Governments. *See, e.g.*, 7-SER-1597–1598 ¶ 11]] ("A vaguely defined prohibition on DEI programs will suppress [Snohomish County's] ability to conduct effective outreach to the populations we serve."); 7-SER-1647–1648 ¶ 16 ("If the term

55

'promoting' covers healthcare referrals to places that offer abortions in addition to other medical care, then this condition would effectively prevent case managers from referring clients to healthcare resources for a wide variety of medical treatment."); 7-SER-1634 ¶ 7 ("At King County, diversity, equity, inclusion, and social justice are not transitory 'policies' that can be set aside, they are concepts that are woven into the fabric of all government functions.").

Accordingly, the Federal Agencies' challenge to the district court's irreparable harm determination fails.

## C. The District Court Properly Determined the Equities Weigh in the Local Governments' Favor.

The district court did not abuse its discretion in weighing the equities. In deciding whether to grant an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Disney Enters. Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (cleaned up). In balancing the equities, courts "explore the relative harms to [the parties], as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (cleaned up). Where the government is a party, the balance of equities and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Here, the district court properly determined that these factors "tip[] sharply in [the Local Governments'] favor." ER-46.

56

In contrast to the Local Governments' showing of "several forms of irreparable harm that are either presently occurring, or are likely to occur" absent an injunction, ER-41, the Federal Agencies "made no showing that dispersing congressionally appropriated funds for statutorily mandated purposes would cause irreparable harm in this case." *Cmty. Legal Servs. in East Palo Alto v. U.S. Dep't of Health and Human Servs.*, 137 F.4th 932, 942 (9th Cir. 2025); *see also Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157, at *23–24 (D.R.I. Apr. 15, 2025) ("Government [was] not harmed where an order require[d] them to disburse funds that Congress ha[d] appropriated and that Agencies ha[d] already awarded"), *appeal docketed*, No. 25-1428 (1st Cir. May 1, 2025). The preliminary injunction here appropriately maintains the status quo reflecting congressional appropriations—i.e. "the last uncontested status which preceded the pending controversy." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1191 (9th Cir. 2024) (cleaned up).

The Federal Agencies claim the district court "underappreciated the clear injury to HUD's and DOT's ability to effectuate Executive Branch policy." Op. Br. at 27. But this Court has rejected substantially similar separation of powers arguments. *See, e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curiam) ("To the extent that the Government claims that it has suffered an

institutional injury by erosion of the separation of powers, that injury is not 'irreparable.' It may yet pursue and vindicate its interests in the full course of this litigation."); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018) (separation of powers argument inadequate to demonstrate irreparable harm). As this Court stated in *Doe #1 v. Trump*, "if we were to adopt the government's assertion that the irreparable harm standard is satisfied by the fact of executive action alone, no act of the executive branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction. That cannot be so." 957 F.3d 1050, 1059 (9th Cir. 2020).

Further, "[t]here is generally no public interest in the perpetuation of unlawful agency action," and "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1015 (9th Cir. 2020) (the public "has an interest in ensuring that statutes enacted by their representatives are not imperiled by executive fiat" (cleaned up)). The Local Governments have made a strong showing that the Federal Agencies are violating the APA and the Constitution. The public interest disfavors allowing them to resume their unlawful conduct during the lawsuit. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (it is not equitable or in the public interest to allow violation of federal

law); *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) ("It is always in the public interest to prevent the violation of a party's constitutional rights." (cleaned up)).

Finally, the Local Governments' federally funded homelessness assistance programs and public transportation projects provide essential services furthering important public interests that will be significantly disrupted if the preliminary injunction is lifted. As the district court noted, the identified harms will impact not only the Local Governments themselves but also the "vulnerable populations they serve," as well as their communities'—and indeed the nation's—ability to get goods and people "from one place to another safely, efficiently, and predictably." ER-43–44. The public interest strongly favors the faithful execution of grant programs that Congress created to help communities across the country "meet the critically urgent needs of the homeless of the Nation," 42 U.S.C. § 11301(b)(2), and improve and maintain public transit, highways, airports, and railroads. Absent a preliminary injunction, the Federal Agencies will refuse to process these grants unless the Local Governments agree to the unlawful Conditions. *See, e.g.*, 6-SER-1391 ¶ 9 (stating Local Governments that excised Conditions from grant agreements "cannot draw down" CoC funds); 1-SER-13 (stating HUD would place KCRHA's grant agreement "on hold . . . because of the pending litigation"). The public interest requires that the

59

injunction remain in place to prevent resulting harm to the communities Congress sought to benefit.

For all of these reasons, the district court did not abuse its discretion in determining the equities weigh strongly in the Local Governments' favor.

### D. The Federal Agencies Waive Any Challenge to the DOT Immigration Enforcement Condition and DOT and COC EO Conditions.

The Federal Agencies do not appeal the preliminary injunction as to the DOT Immigration Enforcement Condition. Op. Br. at 9 n.1. Further, they fail to address the DOT or CoC EO Conditions in their opening brief, thereby waiving any challenge to the district court's order thereon. *See Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1148–49 (9th Cir. 2016). At a minimum, this Court should affirm the preliminary injunction with respect to those three Conditions.

## VIII. CONCLUSION

The Federal Agencies seek to impose on the Local Governments the Trump Administration's novel and unsupported reinterpretation of federal nondiscrimination law, as well as other policy preferences, by leveraging congressionally authorized grant funds under threat of FCA enforcement. But the new or newly interpreted DOT and CoC Conditions are not authorized by, and in some instances are contrary to directives from, Congress. The Conditions also exceed even Congress's power to condition federal funds and violate the APA's

60

requirements for reasoned decision-making and proper process. Further, the district court properly found that the Local Governments will suffer irreparable harm absent injunctive relief and that the equities tip sharply in their favor. This Court should affirm.

RESPECTFULLY SUBMITTED this 15th day of August, 2025.

PACIFICA LAW GROUP LLP

*/s/ Paul J. Lawrence*
Paul J. Lawrence, WSBA #13557
Jamie Lisagor, WSBA #39946
Sarah S. Washburn, WSBA #44418
Meha Goyal, WSBA #56058
Luther Reed-Caulkins, WSBA #62513

PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101
T: 206-245-1700
F: 206-245-1750
Paul.Lawrence@PacificaLawGroup.com
Jamie.Lisagor@PacificaLawGroup.com
Sarah.Washburn@PacificaLawGroup.com
Meha.Goyal@PacificaLawGroup.com
Luther.Reed-Caulkins@PacificaLawGroup.com

*Attorneys for all Plaintiffs-Appellees*

PUBLIC RIGHTS PROJECT

*/s/ Sharanya Mohan*
Sharanya (Sai) Mohan (CA Bar No. 350675)
Naomi Tsu (OR Bar No. 242511)
Toby Merrill (MA Bar No. 601071)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609

61

(510) 738-6788
sai@publicrightsproject.org
naomi@publicrightsproject.org
toby@publicrightsproject.org

*Counsel for Plaintiffs-Appellees City of Columbus, City & County of Denver, Metro Government of Nashville & Davidson County, Pima County, County of Sonoma, City of Bend, City of Cambridge, City of Chicago, City of Culver City, City of Minneapolis, City of Pasadena, City of Pittsburgh, City of Portland, City of San José, City of Santa Monica, City of Tucson, City of Wilsonville, Santa Monica Housing Authority*

## CERTIFICATE OF SERVICE

I, Gabriela DeGregorio, hereby certify that I electronically filed the foregoing Appellees' Response Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system on August 15, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

PACIFICA LAW GROUP LLP

*s/ Gabriela DeGregorio*
Gabriela DeGregorio
Litigation Assistant
401 Union Street, Suite 1600
Seattle, WA 98101
gabby.degregorio@pacificalawgroup.com

63

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** 25-3664

The undersigned attorney or self-represented party states the following:

[**X**] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** *s/ Paul J. Lawrence*　　　　**Date** 8/15/25
*(use "*s/[typed name]*" to sign electronically-filed documents)*

64

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____25-3664_____

I am the attorney or self-represented party.

**This brief contains** ____13,995___**words,** including _0_ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[**X**] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/ Paul J. Lawrence_____ **Date** _____8/15/25_____
  *(use "*s/[typed name]*" to sign electronically-filed documents)*

65