**No. 25-3664**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

COUNTY OF KING, et al.,

Plaintiffs-Appellees,

v.

SCOTT TURNER, Secretary, United States Department of Housing and Urban Development, et al.,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the Western District of Washington

---

**SUPPLEMENTAL BRIEF FOR APPELLANTS**

---

JONATHAN D. GUYNN
*Acting Assistant Attorney General*

DANIEL TENNY
JACK STARCHER
SARAH N. SMITH
*Attorneys, Appellate Staff*
*Civil Division, Room 7515*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8877*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................ 1

BACKGROUND ........................................ 2

ARGUMENT ........................................ 11

I. The Panel Decision Erred in Addressing Important Questions About the Executive's Power to Ensure Appropriate Use of Federal Funds ........................................ 11

II. The Panel Decision Resolves Questions of Exceptional Importance with Nationwide Effect ........................................ 19

CONCLUSION ........................................ 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*County of King v. Turner*,
189 F.4th 819 (9th Cir. 2026) .......... 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19

*National Ass'n of Diversity Officers in Higher Educ. v. Trump*,
167 F.4th 86 (4th Cir. 2026) .......... 14, 15

*United States v. AMC Ent., Inc.*,
549 F.3d 760 (9th Cir. 2008) .......... 15, 21

*Universal Health Servs., Inc. v. United States*,
579 U.S. 176 (2016) .......... 13

**Statutes:**

Civil Rights Act of 1964:
42 U.S.C. § 2000d .......... 4
42 U.S.C. § 2000d-1 .......... 4

McKinney-Vento Homeless Assistance Act:
42 U.S.C. § 11381(1)-(2) .......... 17
42 U.S.C. § 11381(2) .......... 17
42 U.S.C. §§ 11381-11389 .......... 2
42 U.S.C. § 11383 .......... 10
42 U.S.C. § 11386(b)(8) .......... 3, 7, 9, 10, 16

Personal Responsibility and Work Opportunity Reconciliation Act of 1996:
8 U.S.C. § 1611(a) .......... 18
8 U.S.C. § 1611(c) .......... 18

31 U.S.C. § 3729(a) .......... 14

49 U.S.C. § 5334(a)(1) .......... 3, 7

49 U.S.C. § 5334(a)(9) .......... 3, 7

49 U.S.C. § 47108(a) ........ 3

**Regulations:**

24 C.F.R. § 1.5 ........ 4

49 C.F.R. § 21.7 ........ 4

**Rules:**

Fed. R. App. P. 40(b)(2)(C) ........ 20

Fed. R. App. P. 40(b)(2)(C)-(D) ........ 11

## INTRODUCTION

To receive federal funding, grant recipients must generally enter into grant agreements, in which the recipient agrees to comply with certain conditions in exchange for federal dollars. The conditions at issue here fall into two categories: certifying acceptance of recipients' existing legal obligations or placing reasonable limitations on the use of federal funds. These sorts of conditions—directing grant recipients to deploy federal funds in ways that further the public interest—are routine and they plainly fall within the relevant agencies' statutory authority.

The panel nevertheless affirmed in significant part the district court's preliminary injunction prohibiting defendants from imposing these conditions. As Judge Bumatay noted in his dissent, the panel's decision inappropriately intruded on the prerogatives of Congress and the Executive Branch, effectively substituting the policy judgments of the Court for those of Congress and the President. The power of the purse belongs to the politically accountable branches, not the judiciary. The panel's decision disregarded that reality, and that "overstep" into the prerogatives of the Executive warrants en banc review.

The issues presented here are important, especially in light of the fact that the panel decision effectively decides these questions for large swaths of the country. Plaintiffs have amended their complaint three times to add additional plaintiff jurisdictions from across the country to this action. The preliminary injunction at issue applies to cities and counties located in almost every other regional circuit in the country, including cities like Boston, New York, Pittsburgh, Columbus, Chicago, Minneapolis, and Denver. Given the ever-expanding, nationwide reach of this lawsuit, the issues at stake warrant en banc review.

## BACKGROUND

A. At issue in this case are several grant programs administered by the Department of Housing and Urban Development (HUD) and the Department of Transportation (DOT). Of particular relevance here, the McKinney-Vento Homeless Assistance Act created HUD's Continuum of Care grant program. Under that program, HUD awards grants to non-profits and local governments that provide housing and supportive services to the homeless. 42 U.S.C. §§ 11381-11389. By statute, jurisdictions that receive grants under that program must comply with various conditions. In addition to an enumerated list of mandatory conditions,

Congress expressly gave HUD authority to require compliance with "such other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner." *Id.* § 11386(b)(8).

DOT and its operating administrations operate many grant programs that provide funding to maintain and develop the nation's infrastructure, from airports to rail to mass transit systems. In connection with those grant programs, DOT has long imposed conditions to further the purposes of the program. In imposing these conditions, DOT relies on broad grants of statutory authority to include in any agreement terms that the Secretary considers necessary to carry out the funding program. *See* 49 U.S.C. § 5334(a)(1), (9) (Secretary of Transportation may "prescribe terms for a project" that receives federal funding and may "include in an agreement or instrument … a covenant or term [he] considers necessary to carry out" funding Federal Transit Administration programs); *id.* § 47108(a) (Secretary "may impose terms … that [he] considers necessary to carry out" Federal Aviation Administration's funding programs). As particularly relevant here, DOT agreements have long required that funding recipients comply with all applicable federal laws, regulations, and requirements, including executive orders.

Under Title VI of the Civil Rights Act of 1964, recipients of federal assistance must comply with federal anti-discrimination law. 42 U.S.C. § 2000d. Title VI further "authorize[s] and direct[s]" federal agencies that award federal funds to effectuate § 2000d by issuing rules and regulations. *Id.* § 2000d-1. Pursuant to that authority, HUD and DOT have promulgated regulations requiring that applications for financial assistance include, as a condition of payment, assurances that the recipient complies with federal anti-discrimination law. 24 C.F.R. § 1.5 (HUD); 49 C.F.R. § 21.7 (DOT).

B. In January 2024, HUD posted a notice of funding availability for the Continuum of Care grant program for fiscal years 2024 and 2025. After awarding fiscal year 2024 grants in January 2025, HUD presented grant recipients with agreements that included conditions requiring recipients to agree to two kinds of certifications. First, recipients had to certify that they do "not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964" and that compliance with applicable Federal anti-discrimination laws is material, for purposes of the False Claims Act, to the government's decision to pay out the grant funds. Second, recipients had to certify that

they will not use the grant funds to promote various policy objectives that have nothing to do with the program's purpose of providing housing and supportive services to the homeless. In particular, the second category of conditions required certifications that the grant recipient would not use the grant funds to "promote 'gender ideology,'" "to fund or promote elective abortions," or to "facilitate[] the subsidization or promotion of illegal immigration or abet[] policies that seek to shield illegal aliens from deportation." ER-14. Additionally, each grant recipient must certify that it will use "[Systemic Alien Verification for Entitlements (SAVE)], or an equivalent verification system approved by the Federal government to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States." ER-14.

In Spring 2025, DOT updated the grant agreements associated with various grant programs to include new conditions requiring the recipient to certify "that it does not operate any programs promoting diversity, equity, and inclusion … initiatives that violate any applicable Federal anti-discrimination laws" and that compliance "with all applicable Federal anti-discrimination laws is material to the government's payment decisions for

purposes of [the False Claims Act]." ER-15; *see also* ER-108-12 (Federal Highway Administration); ER-112-17 (Federal Aviation Administration); ER-117-20 (Federal Railroad Administration); ER-120-23 (Strengthening Mobility and Revolutionizing Transportation grants).

C. Plaintiffs are counties, cities, and local housing and transportation agencies that received or were conditionally awarded grants from HUD and DOT that are subject to the challenged funding conditions. ER-52-156. Plaintiffs allege that those funding conditions are unconstitutional, exceed the agencies' statutory authority, and violate the Administrative Procedure Act. *See* ER-128-43.

The district court entered a preliminary injunction, prohibiting HUD and DOT from enforcing or requiring certification of the challenged conditions in connection with funds awarded to plaintiffs, or from otherwise withholding grant funding from plaintiffs based on the challenged conditions. In granting the injunction, the court concluded that plaintiffs were likely to succeed on their claim that the challenged funding conditions are not authorized by statute and therefore violate the separation-of-powers doctrine. ER-33-39. For HUD, the court determined that the Homeless Assistance Act does not expressly authorize any of the

challenged funding conditions. ER-36. The court acknowledged that the Act empowers the Secretary to impose "other terms and conditions … to carry out" the Continuum of Care program "in an effective and efficient manner," 42 U.S.C. § 11386(b)(8), but the court concluded that this catchall provision does not authorize the challenged conditions, which it deemed "[s]ubstantive conditions implicating controversial policy matters that are unrelated to the authorizing statute," ER-36.

The district court similarly concluded that DOT lacked statutory authority to impose its challenged funding conditions. ER-37. The court rejected the government's argument that statutory provisions authorizing the Secretary to "prescribe terms for a project" that receives funding and to include terms that he "considers necessary to carry out" the programs provided such authority. ER-38 (quoting 49 U.S.C. § 5334(a)(1), (9)). The court determined that these provisions only grant the Secretary authority to "administer the programs" and not the power "to inject substantive policies into them." ER-38.

D. On appeal, a divided panel substantially affirmed the district court's decision. *County of King v. Turner*, 189 F.4th 819 (9th Cir. 2026). The panel held that the government could require grant recipients to certify

their compliance with Title VI's prohibition on discrimination in federally funded programs, so long as the certification was limited to the program or activity receiving funding. *Id.* at 830. But the panel concluded that the agencies could not require grant recipients to agree that compliance with "all applicable Federal anti-discrimination laws is material," for purposes of the False Claims Act, to the government's decision to pay out their grants. *Id.* at 831-32. The majority concluded that condition effectively imposed the government's own definition of materiality and amounted to an "end run" around the scheme Congress created in the False Claims Act. *Id.* at 831.

As to the remaining conditions imposed by HUD, the panel majority concluded that the agency lacked specific statutory authority to require grant recipients to certify that the federal grant funds they received to combat homelessness would not be used to promote various other policy goals, like elective abortions, "gender ideology," or illegal immigration. *King*, 189 F.4th at 832. The majority categorized those certifications as "restrict[ing] not only the immediate destination of the funds … but also the effect of the projects toward which those funds are directed." *Id.* at 833 (emphasis omitted). So understood, the majority rejected HUD's argument

that it had authority to impose those conditions under the express terms of the underlying statute, which empowers the Secretary to impose "other terms and conditions … to carry out" the program "in an effective and efficient manner." 42 U.S.C. § 11386(b)(8). The panel also concluded that the district court did not abuse its discretion in concluding the remaining preliminary injunction factors favored the plaintiffs.

Judge Bumatay concurred in the panel's conclusion about the Title VI certification but otherwise dissented. On the False Claims Act materiality certification, the dissent noted that it should not be surprising that compliance with applicable anti-discrimination laws is "of the utmost importance" when the government decides to fund a program. *King*, 189 F.4th at 842-43 (Bumatay, J., concurring in part and dissenting in part). Put another way, the government (understandably) does not want to fund programs that illegally discriminate, making the certification a "straightforward admission[] to a true statement." *Id.* at 842. And nothing about the certification pretermits the scheme Congress created in the False Claims Act—in any action brought by the government under the Act, "the government must still prove each element of the [statute] to secure a win." *Id.* at 843. To the extent the majority's decision turns on an assumption that

some violations of anti-discrimination law may not be material, preemptively enjoining the condition in all circumstances is premature. *Id.* If a recipient thinks any particular violation of federal antidiscrimination law is *not* material, it would have ample opportunity to contest materiality in the context of any actual False Claims Action case the government might bring. *Id.*

As for the remaining challenged conditions imposed by HUD, the dissent noted that, by statute, Congress made clear that the Continuum of Care program is designed to support the homeless, meaning that grant funding must be "used to carry out projects that serve homeless individuals or families." *King*, 189 F.4th at 844 (quoting 42 U.S.C. § 11383). In order to achieve those goals, Congress gave HUD "broad flexibility" to impose conditions to ensure limited grant funds are deployed in a way that will "accomplish programmatic purposes 'in an effective and efficient manner.'" *Id.* (quoting 42 U.S.C. § 11386(b)(8)). "Directing funding recipients to avoid funding activities HUD reasonably considers peripheral to the goal of ending homelessness fits easily within the statute's grant of discretion." *Id.* In seeking to ensure that funded programs seek to end homelessness in an "effective and efficient manner," it is "reasonable to

prevent the dilution of" the statute's purposes by prohibiting "the redirection of funds toward unrelated policy goals." *Id.* at 844-45.

## ARGUMENT

Rehearing en banc is warranted. As particularly relevant here, rehearing en banc is warranted when a case "involves one or more questions of exceptional importance" or conflicts with a decision of another court of appeals. Fed. R. App. P. 40(b)(2)(C)-(D). Those standards are met here.

### I. The Panel Decision Erred in Addressing Important Questions About the Executive's Power to Ensure Appropriate Use of Federal Funds.

The panel majority addressed two sets of conditions and erred on important questions as to both sets.

1. While the panel correctly concluded that federal agencies have authority to require federal grant recipients to certify their compliance with applicable federal anti-discrimination laws, it prevented the agencies from requiring grant recipients to acknowledge that the federal government cares about compliance with those laws and considers such compliance "material" for purposes of the False Claims Act. As the dissent noted, that certification is just a "straightforward admission[] to a true statement."

*County of King v. Turner*, 189 F.4th 819, 842 (9th Cir. 2026). Both HUD and DOT have made clear that compliance with Title VI is of the "utmost importance," and neither plaintiffs nor the panel majority seriously contest that the federal government has a significant, obvious interest in ensuring that federal government dollars are not funding programs that, for example, discriminate based on race or national origin.

Instead, the majority simply asserted that this certification is impermissible because it "sidestep[s]" the requirement that the government prove materiality in order to win a False Claims Act case. *King*, 189 F.4th 831. Alternatively, the panel majority categorized the certification as effectively defining what materiality means, displacing the role of "courts to interpret that provision and to apply the definition to the facts of a particular case." *Id.* But neither of those assertions is true, as the dissent noted. The certification of materiality does not lower the government's burden of proof, redefine materiality for purposes of judicial review, or sidestep the "materiality" requirement that Congress imposed in the statute. Whether a false statement is material under the False Claims Act is a holistic inquiry, and the government's "decision to expressly identify a provision as a condition of payment is relevant, but not

automatically dispositive." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 194 (2016). Thus, plaintiffs' certification would be evidence of materiality, and reasonably so: the condition puts plaintiffs on notice that "for some special reason [the representation] is likely to induce the [government] to manifest [its] assent to the transaction." *Id.* at 193. But the condition does not lower the standard required under the False Claims Act, and plaintiffs would remain free to challenge materiality, and the relevance of their certification, if any False Claims Act suit were ultimately filed (particularly given that the government has made clear here, and the Court could reiterate in its opinion, that the condition does not preclude them from doing so). Indeed, as the majority noted, "[m]ateriality is a central and often hotly contested issue" in False Claims Act cases. *King*, 189 F.4th at 831.

The majority insisted that the certification is nevertheless problematic because of its "breadth." *King*, 189 F.4th at 831. In particular, the majority concluded that "[y]ou don't have to be Nostradamus to 'predict[] … what will happen' in future litigation," seemingly anticipating that the government will seek to use the certification in future lawsuits against plaintiffs based on novel or incorrect *interpretations* of federal

antidiscrimination law. *Id.* at 832. For starters, that hypothetical fear is undercut by a different requirement of the False Claims Act: plaintiffs could not be held liable under the False Claims Act unless they *knowingly* falsely certified their compliance with federal antidiscrimination law. 31 U.S.C. § 3729(a). A good-faith belief that their actions were lawful would be sufficient to defeat False Claims Act liability.

In any event, as the dissent noted, in relying in significant part on assumptions about arguments the government might make in future, "imaginary [False Claims Act] litigation," the majority only underscored that the injunction it upheld is premature. *King*, 189 F.4th at 843. That aspect of the panel's decision—allowing an injunction against grant conditions based on predictions about how those conditions might be interpreted or applied in the future—is also in tension with the Fourth Circuit's decision in *National Ass'n of Diversity Officers in Higher Education v. Trump* (*NADOHE*), 167 F.4th 86, 102-04 (4th Cir. 2026). There, the Fourth Circuit rejected the plaintiffs' constitutional challenges to the requirement that all federal grant recipients certify that their compliance "in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions" under the False Claims Act. *Id.* at 94. In

so holding, the panel rejected the plaintiffs' invitation to presume that, in enforcing that provision, the government would misapply or overread federal antidiscrimination law. The Fourth Circuit refused to "read subtext into" the certification by considering how the agencies might "interpret antidiscrimination law in relation to plaintiffs'" programming in the future. *Id.* at 104. If any defendant misinterprets federal law in some future case, plaintiffs "can challenge that interpretation in a specific enforcement action." *Id.* But the Fourth Circuit refused to prejudge those questions in the abstract, concluding—as the dissent noted here—that it "would be premature to enjoin the" conditions now. *King*, 189 F.4th at 843.

As explained in more detail below, that tension is particularly problematic given that plaintiffs in this case have since amended their complaint to include the City of Baltimore, which is located within the Fourth Circuit, as a plaintiff in this action. *See* Second Amended Complaint, Dkt. No. 184. The tension between the unanimous panel decision in *NADOHE* and the panel majority raises issues of inter-circuit comity. *See United States v. AMC Ent., Inc.*, 549 F.3d 760, 771 (9th Cir. 2008) ("[W]e must be mindful of the decisions of our sister circuits, when we

make decisions in cases affecting litigants' legal rights and remedies in the geographic boundaries of their circuits.").

2. The majority also badly erred in its interpretation of a broad, catch-all grant of authority allowing HUD to impose "such other terms and conditions as the Secretary may establish" to ensure the Continuum of Care grant program operates "in an effective and efficient manner." *King*, 189 F.4th at 826 (quoting 42 U.S.C. § 11386(b)(8)). That program directs HUD to award grants to non-profits and local governments that provide housing and supportive services to the homeless. As the dissent concluded, the challenged HUD conditions readily fall within the agency's "authority to set conditions that advance the effectiveness and efficiency of the funding program" by "[d]irecting funding recipients to avoid funding activities HUD reasonably considers peripheral to the goal of ending homelessness." *Id.* at 844-45.

The majority's invocation of *ejusdem generis* to support its contrary conclusion is wrong. *See King*, 189 F.4th at 835. The majority acknowledged that several other conditions listed in § 11386(b) impose "substantive" limitations on the grant-funded activities, but concluded that HUD can only impose substantive conditions that are "tied to the statute's

underlying goals of 'ending homelessness,'" *id.*, and "quickly rehous[ing] homeless individuals and families while minimizing the trauma and dislocation" to homeless people, 42 U.S.C. § 11381(2). But as the dissent noted, the challenged conditions *do* further those statutory purposes: "spending federal dollars allocated for the homeless" to promote "hot-button political issues *unrelated* to homelessness is not 'effective and efficient.'" *King*, 189 F.4th at 841. "[E]very dollar spent promoting extraneous political causes, like gender ideology, elective abortion, and illegal immigration, is a dollar not spent," *id.*, furthering the statute's purposes of "ending homelessness" or "quickly rehous[ing] homeless individuals," 42 U.S.C. § 11381(1)-(2). To use the terminology the majority endorsed, requiring funds to be spent in a way that focuses on the purposes of the program, instead of unrelated policy objectives, obviously makes the funded programs more "effective" and "product[ive]" in achieving the purposes Congress enumerated. *King*, 189 F.4th at 834.

The challenged HUD conditions all fall comfortably within that understanding of the statute. HUD reasonably concluded that expending funds to promote extraneous policy objectives like gender ideology, elective abortions, or illegal immigration is not an "effective and efficient"

way to spend funds designed to provide housing and services to the homeless. As for the requirement that jurisdictions "use SAVE, or an equivalent verification system approved by the federal government, to prevent any Federal public benefit from being provided to an ineligible alien," even the majority acknowledged that the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) already makes clear that individuals who are not "qualified alien[s]," 8 U.S.C. § 1611(a), are "not 'eligible for any Federal public benefit,' including 'any grant … provided by an agency,'" *King*, 189 F.4th at 837 (quoting 8 U.S.C. § 1611(a), (c)). The challenged conditions merely specify how recipients should go about fulfilling that existing obligation. HUD reasonably concluded that verifying status via SAVE or an equivalent verification system is the most "effective and efficient" way to ensure that program funds are not expended in ways that violate PRWORA. As the dissent noted, that decision was especially reasonable given SAVE's "recent upgrades" and free "availability to local governments." *King*, 189 F.4th at 845.

As the dissent emphasized, *King*, 189 F.4th at 846-48, the majority's decision does not actually turn on its interpretation of the plain meaning of

the words "effective and efficient," or its conclusion that the authority Congress gave HUD must be deployed in furtherance of the statute's overarching purposes. Instead, the majority's decision turns on its disagreement with the Executive Branch's judgment about how best to achieve those purposes. While the "majority might disagree with the Executive on whether spending money on supporting illegal immigration, gender ideology, and elective abortion is worthwhile," the conditions imposed do not "violate Congress's grant of discretion" and courts therefore "have no business superseding Congress's and the Executive's will." *Id.* at 846-47.

## II. The Panel Decision Resolves Questions of Exceptional Importance with Nationwide Effect.

The issues presented here are of particular importance because, if left undisturbed, the panel decision here will effectively resolve the questions at issue for broad swaths of the country. Plaintiffs have amended their complaint three times, adding additional plaintiff jurisdictions from across the country to this action. *See* Third Amended Complaint, Dkt. No. 369. As the district court acknowledged, the injunction here prevents defendants from imposing the relevant grant conditions on cities and

counties located in almost every other regional circuit court in the country, including cities like Boston (First Circuit), New York (Second Circuit), Pittsburgh (Third Circuit), Columbus (Sixth Circuit), Chicago (Seventh Circuit), Minneapolis (Eighth Circuit), and Denver (Tenth Circuit). ER-4 n.1. And plaintiffs have since amended their complaint to add other cities from other circuits, including Baltimore (Fourth Circuit). *See* Second Amended Complaint, Dkt. No. 184. Given the ever-expanding, nationwide reach of this lawsuit, the panel decision here might effectively decide these questions for much of the country.

While rehearing en banc is often appropriate where the panel decision "conflicts with an authoritative decision of another United States court of appeals," Fed. R. App. P. 40(b)(2)(C), given the nationwide—and ever-expanding—scope of this case, further inter-circuit percolation of these issues is unlikely. Indeed, it is unclear why a local government in any other circuit would choose to challenge conditions like those at issue here in their home circuit rather than simply joining this case to gain the benefit of the panel decision. So, while inter-circuit disagreement is sometimes an important consideration in granting rehearing en banc, it is unlikely that such inter-circuit percolation will occur here.

The importance of the issues presented by the injunction here are underscored by principles of judicial comity. As this Court has recognized, injunctions that control a party's conduct within the geographical area of sister circuits raise unique and important considerations. *See AMC Ent.*, 549 F.3d at 770 ("when exercising its equitable powers to issue an injunction, a court must be mindful of any effect its decision might have outside its jurisdiction" and "ordinarily should not award injunctive relief that would cause substantial interference with another court's sovereignty"). Those kinds of injunctions—like the one here—interfere with the authority of other circuits and create tension in the operation of "[o]ur federal judicial system," which provides that "when the Ninth Circuit or any of its coequal circuit courts issue an opinion, the pronouncements become the law of that geographical area." *Id.* at 771. Here, large cities and counties from nearly every sister circuit have joined in this action and now benefit from the panel's decision, even though the law of their home circuits may lead to different conclusions about the statutory questions at issue.

## CONCLUSION

For the foregoing reasons, the Court should rehear this case en banc.

Respectfully submitted,

JONATHAN D. GUYNN
*Acting Assistant Attorney General*
DANIEL TENNY
_/s/ Jack Starcher_____________
JACK STARCHER
SARAH N. SMITH
*Attorneys, Appellate Staff*
*Civil Division, Room 7515*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8877*

November 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with this Court's October 20, 2026, order because it contains 4,064 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Jack Starcher*
Jack Starcher

## CERTIFICATE OF SERVICE

I certify that on November 10, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Case Management System (ACMS). Service will be accomplished by ACMS.

*s/ Jack Starcher*
Jack Starcher